FILED
2016 Jan-13  PM 05:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | } | |
| | } | |
| v. | } | Case No.:  5:15-cr-55-MHH-HGD |
| | } | |
| ERIC SLOAN PARKER, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

This matter is before the Court on defendant Eric Parker's renewed motion for a judgment of acquittal.  Mr. Parker asks the Court to enter judgment in his favor on the charge that he violated 18 U.S.C. § 242.  Section 242 states:

> Whoever, under color of any law, . . . willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; . . . .

18 U.S.C. § 242.[1]  Officer Parker contends that the Court should grant his motion for judgment of acquittal because the Government has failed to prove beyond a reasonable doubt that he willfully violated Mr. Sureshbhai Patel's asserted Fourth Amendment right to be free from law enforcement officers' unreasonable use of force.   Rule 29 of the Federal Rules of Criminal Procedure governs Officer Parker's motion.

Rule 29 provides, in pertinent part, that a defendant "may move for a judgment of acquittal, or renew such a motion, within 14 days . . . after the court discharges the jury," and the court may enter a judgment of acquittal "[i]f the jury has failed to return a verdict."  Fed. R. Crim. P. 29(c)(1)–(2).  The jury failed to return a verdict after the second trial in this case.  Officer Parker orally renewed his motion for judgment of acquittal after the jurors advised the Court that they were unable to reach a unanimous verdict, and the Court took up the renewed motion after the Court discharged the jury.  (Doc. 110, pp. 4-5, 7-12).  Therefore, the Court may enter a judgment of acquittal if the record supports such a judgment.

When considering a motion for the entry of a judgment of acquittal,

---

[1] Section 242, previously codified at 18 U.S.C. § 52, "was enacted to enforce the Fourteenth Amendment.  It derives from § 2 of the Civil Rights Act of April 9, 1866, 14 Stat. 27.  Senator Trumbull, chairman of the Senate Judiciary Committee which reported the bill, stated that its purpose was 'to protect all persons in the United States in their civil rights, and furnish the means of their vindication.'"  *Screws v. United States*, 325 U.S. 91, 98 (1945) (citations and footnotes omitted).  "The prohibition against the 'deprivation of any rights, privileges, or immunities, secured or protected by the Constitution and laws of the United States' was introduced" in 1874. *Id.* at 99.  Congress added the requirement of willful conduct 35 years later.  *Id.* at 100.

"a district court must view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. The prosecution need not rebut all reasonable hypotheses other than guilt. The jury is free to choose between or among the conclusions to be drawn from the evidence presented at trial, and the district court must accept all reasonable inferences and credibility determinations made by the jury."

*United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005) (quoting *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989)); *see also United States v. Taylor*, 972 F.2d 1247, 1250 (11th Cir. 1992) ("When considering a motion for judgment of acquittal, the task confronting a district court is clear . . . . [T]he 'district court must determine whether the relevant evidence, viewed in a light most favorable to the Government, could be accepted by a jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.'") (quoting *United States v. Varkonyi*, 611 F.2d 84, 85 (5th Cir. 1980)).[2]

---

[2] When evaluating a motion for judgment of acquittal after the discharge of a jury, a district court may "consider only the evidence submitted at the time of the motion in making its ruling, whenever made." Fed. R. Crim. P. 29, Advisory Committee Notes; *see also United States v. Isaacson*, 752 F.3d 1291, 1304 (11th Cir. 2014) (when reviewing a judgment of conviction, the Eleventh Circuit "consider[s] only the evidence that was actually presented to the jury at the time it reached its verdict."), *cert. denied*, 135 S. Ct. 990 (2015). In this case, Mr. Parker's Rule 29(c) motion for judgment of acquittal follows two trials. Although the evidence in the two trials is mostly consistent, there are minor differences in the records from the trials. To determine whether a reasonable jury could find Officer Parker guilty beyond a reasonable doubt, the Court will focus on the evidence presented at the second trial but will note additional evidence from the first trial to identify other potential combinations of evidence that the Government might try to introduce to persuade a reasonable jury of Officer Parker's guilt beyond a reasonable doubt. Periodically, the Court will cite evidence from both trials to illustrate that the evidence is largely duplicative.

The Government asserts that Eric Sloan Parker, while serving as an officer of the Madison Police Department, violated 18 U.S.C. § 242 by willfully depriving Mr. Sureshbhai Patel of his asserted right under the Fourth Amendment to be free from the use of unreasonable force by a law enforcement officer.  (Doc. 1, p. 1).[3] The charge against Officer Parker arises from an encounter that Officer Parker had with Mr. Patel on February 6, 2015 that ended with Officer Parker taking Mr. Patel to the ground.  A jury may find Officer Parker guilty of a violation of § 242 only if the Government proves beyond a reasonable doubt:  that Officer Parker acted under color of law; that he deprived Mr. Patel of a right secured to him and protected by the Constitution or laws of the United States, in this case, the right to be free from the unreasonable use of physical force by law enforcement officers; that Officer Parker acted willfully; and that his actions resulted in bodily injury to Mr. Patel.  (Doc. 107, pp. 141-42).  There is no doubt that Officer Parker was acting under color of state law when he encountered Mr. Patel, and the record contains clear evidence that Mr. Patel suffered bodily injury.[4]  A reasonable jury

---

[3] The Fourth Amendment states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

[4]  The Court has referred to the defendant as "Officer Parker" throughout these proceedings in recognition of the fact that Mr. Parker was acting under color of law throughout the events that gave rise to the charge against him.  The Madison Police Department suspended Mr. Parker shortly after February 6, 2015.

To establish Mr. Patel's bodily injury, the Government introduced photographs of Mr. Patel's bloody nose, testimony from a medic who treated Mr. Patel during the trip to the hospital, and testimony from Dr. Cheng Tao who performed surgery on Mr. Patel's neck to mitigate the

could find beyond a reasonable doubt that the Government proved these two elements of the charge against Officer Parker.  Indeed, it would be unreasonable to find otherwise on the evidence in the record in this case.

The evidence relating to the questions of whether there was an unreasonable use of force and whether Officer Parker willfully deprived Mr. Patel of rights that may be secured to Mr. Patel under the United States Constitution is another matter. The evidence relating to use of force and willfulness is hotly contested.  These two elements of the charge against Officer Parker must be assessed independently because the first—reasonable use of force—is measured by an objective standard while the second—willfulness—involves a subjective test.  *Graham v. Connor*, 490 U.S. 386, 397 (1989).[5]  The Court examines these elements in turn.

---

damage to Mr. Patel's spinal cord.  (GX 11; Doc. 105, pp. 71-75, 88, 142-49).  Dr. Tao treated Mr. Patel for central cord syndrome resulting from a traumatic injury to the spinal cord.  (Doc. 105, pp. 72-75; Doc. 66, pp. 9-12; GX 15-20).

[5] "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."  *Graham*, 490 U.S. at 397.  Indeed, consideration of an individual officer's subjective motivation "is incompatible with a proper Fourth Amendment analysis" of the reasonableness of the use of force.  *Id.*  In contrast, to establish willful conduct under § 242, the Government must prove beyond a reasonable doubt that Officer Parker acted with a "bad purpose."  *Screws v. United States*, 325 U.S. 91, 103 (1945) ("But as we have seen, the word 'willfully' was added to make [Section 242] 'less severe'. We think the inference is permissible that its severity was to be lessened by making it applicable only where the requisite bad purpose was present, thus requiring specific intent not only where discrimination is claimed but in other situations as well.").

## I. Reasonableness of Force

### A.  Evidence

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* And "reasonableness" must be evaluated based on the totality of the circumstances confronting an officer at "the moment" the officer employed force: "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* (citation omitted) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Consistent with these principles of law concerning reasonable use of force, the Court instructed the jurors as follows:

> Unreasonable force is physical force that exceeds the objective need to use such force.

Whether a specific use of force is reasonable or unreasonable depends on the totality of the facts and circumstances of each case. Those facts include the severity of the crime the person is being arrested for, whether a suspect poses an immediate violent threat to others, and whether the suspect resists or flees.

If you find that Mr. Parker used force against Mr. Patel, you must then decide whether the force he used was unreasonable based on the degree of force that a reasonable and prudent law enforcement officer would have applied under the same circumstances.

The calculus of reasonableness must allow for the fact that police officers are often forced to make quick, split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation.

(Doc. 107, pp. 143-44; *see also* Doc. 69, p. 152).

The Madison Police Department's "Response to Resistance" policy, which governed Officer Parker's conduct on February 6, 2015, incorporates many of the legal principles contained in the Court's use of force instruction. That policy states:

It is the policy of the Madison Police Department that sworn personnel use that amount of force which is reasonable to accomplish the lawful objectives of the [MPD] in order to gain compliance and bring incidents or persons under control.

(GX26, p. 1, admitted at Doc. 106, p. 12). The policy authorizes sworn personnel:

to use that amount of non-deadly force which is reasonably necessary for

a. self-defense
b. defense of another person

7

   b. [sic] overcome resistance or enforce compliance as quickly as possible in anticipation of and/or to prevent the escalation of resistance
   c. preventing escape
   d. gaining safe and effective control of unlawful situations.

(GX26, p. 2).  The policy defines "Objectively Reasonable" as "[a] circumstance or a set of circumstances which would likely cause a reasonable officer to act or think in a similar way under similar circumstances."  (GX26, p. 1).  The policy requires officers who use force to "be able to articulate that their decisions and actions were reasonable at the time of a response to resistance incident based on the totality of the circumstances and information available to them at the time." (GX26, p. 2).

   The parties developed a robust evidentiary record concerning the totality of the circumstances surrounding Office Parker's use of force.  That evidence starts with the call that brought Officer Parker to the Hardiman Place neighborhood in Madison, Alabama on the morning of February 6, 2015.  Around 8:00 a.m. that morning, the Madison County 911 center received a suspicious subject call on its nonemergency line from a known caller[6] who lived in the Hardiman Place neighborhood.[7]  The caller reported that a black male wearing a toboggan cap,

---

[6] A "known caller" is one who gives his or her name, phone number, and address when contacting the authorities.  (Doc. 69, p. 43).

[7] The record demonstrates that the Madison Police Department (also called the MPD throughout this opinion) urges members of the community to contact the police department regarding suspicious activity.  (Doc. 105, pp. 39-42, 101-02, 111-12; Doc. 106, pp. 14-16).

sweater, and jeans was walking into yards, standing in driveways, and looking into garages.  (Doc. 105, pp. 6-7, 9-11, 84-85, 114-15; Doc. 65, pp. 23, 30, 51, 54, 72, 77, 101; Doc. 66, pp. 39-41).  The caller stated that he had lived in the Hardiman Place neighborhood for four years, he had never seen the subject before, he was nervous about leaving his house to go to work because his wife and child were at home, and the subject was acting suspiciously.  (Doc. 105, pp. 25-26, 34, 98-99; Doc. 65, pp. 55, 74).

Based on the information that the known caller provided, the Madison Police Department dispatch issued the following "Check Subject" radio call:

> The area of 148 Hardiman Place, black male toboggan, jeans white or light colored sweater.  Last seen northbound on Hardiman Place. Standby.  Advising he's walking in the yard standing by the driveways and looking around the garages.

(GX3, admitted at Doc. 105, p. 7; *see also* Doc. 105, p. 8; Doc. 107, pp. 49-50, 92-93).[8]  Dispatch provided the following additional information via the officers' patrol car laptop computers:  the caller had lived in the Hardiman Place neighborhood for four years, the caller had never seen the subject before, and the caller was nervous about leaving his wife and child at home because of the way the subject was behaving.  (Doc. 105, pp. 6-7, 10-11, 24-26; Doc. 107, p. 50).

---

[8] GX3 is an audio recording of the dispatch communication regarding the events at Hardiman Place.  The Government prepared a written transcript of that recording to assist the jury.  The written transcript is marked for identification as GX4.  (Doc. 105, p. 7).  The parties stipulated that the audio recording is accurate.  (Doc. 105, pp. 7, 13-14).

Under MPD policy, if a known caller gives information that indicates a violation of law may have been committed, then the police have reasonable suspicion to investigate. (Doc. 107, p. 52). Lieutenant Clinton Harrell, one of Officer Parker's commanding officers, acknowledged that when an officer receives the type of information contained in the dispatch call, the officer must investigate the situation. (Doc. 105, p. 99; Doc. 65, pp. 101-02, 109).[9] Captain John Stringer, another superior officer in Officer Parker's chain of command, testified that when an officer is dispatched to respond to a call about a suspicious individual, the officer is expected to conduct a preliminary investigation. (Doc. 106, p. 22).[10]

According to Captain Stringer, under written MPD policy, when carrying out a preliminary investigation an officer must "make sure the scene is safe, make sure they can safely proceed with the preliminary investigation, identify witnesses [and] suspects, and attempt to document who they are." (Doc. 106, p. 22). An officer must, to the extent possible, identify the suspicious individual, determine where the individual lives, and find out what the individual is doing and why he is

---

[9] On February 6, 2015, Officer Harrell held the rank of Corporal. He was elevated to the rank of Lieutenant before the trial in this case. (Doc. 105, p. 83). The Court refers to Officer Harrell as Lieutenant Harrell throughout this opinion.

[10] Captain Kenneth Sanders, the Government's use-of-force expert, does not believe that Officer Parker violated police standards when he stopped Mr. Patel. (Doc. 106, p. 59).

in a particular area.  (Doc. 105, pp. 23-24, 97; Doc. 106, p. 36; Doc. 65, pp. 56-57; Doc. 65, pp. 100-01).[11]

Relying on his twenty years of experience as a patrol officer, Officer Charles Spence, one of the officers who responded to the "check subject" call, stated that an officer who responds to a check subject call does not know what to expect "because you don't know the situation you are going into.  Any situation we go into usually is totally unknown.  All right?  Unknown mental status, unknown behavioral status, unknown weapons, knives, drugs."  (Doc. 105, p. 18; *see also* Doc. 105, p. 31).  Officers are trained to treat every call as a serious call and to take nothing for granted because every situation is potentially dangerous.  (Doc. 105, pp. 18, 23-24, 30-31; Doc. 65, pp. 59, 71).  To understand what is happening, an officer must speak to the subject "and then make a determination while [the officer] is on the scene."  (Doc. 105, p. 18).  Often, an officer will find that a reported suspicious person is doing nothing illegal, but sometimes an officer discovers that the reported individual has been engaged in criminal activity or has an outstanding warrant.  In those instances, the officer arrests the suspicious person.  (Doc. 105, pp. 18-19, 23-24).

---

[11] Alabama Code § 15-5-30 provides that a police officer "may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions."

11

When the MPD "check subject" dispatch call went out on February 6, 2015, three MPD officers were close to the Hardiman Place neighborhood—Officers Charles Spence, Eric Parker, and Andrew Slaughter.   These three officers responded to the call.   Based on the information provided in the dispatch call, Officers Spence and Parker suspected that a burglary might be in progress.   (Doc. 105, p. 28; Doc. 107, pp. 50-51, 78; Doc. 65, p. 58).[12]

One of the factors that an officer must consider in evaluating the totality of the circumstances concerning the use of force is the nature of the conduct in which the subject is engaged.   (Doc. 106, pp. 107, 137-38).   The record demonstrates that a reasonable officer in Officer Parker's position would suspect that the individual who the known caller described was involved in a burglary.   Officer Spence explained that there were periodic residential and automobile break-ins in the Hardiman Place area.   (Doc. 105, pp. 28, 38; *see also* Doc. 106, p. 30; Doc. 65, pp. 23, 69-70).   Officer Parker testified that individuals who are planning a burglary often case houses, "seeing if anyone is home, especially early in the morning, that's when most people have left their homes for work.   So those houses are empty."   (Doc. 107, p. 51).   For the three-month period from November 1, 2014 until February 6, 2015, there were 100 burglaries in the City of Madison, two-

---

[12] There is no evidence that Officers Spence and Parker communicated with one another before they proceeded to the Hardiman Place neighborhood.   Officer Spence was travelling in one patrol car, and Officers Parker and Slaughter were riding in another patrol car.   During trial, Officers Spence and Parker testified separately about their suspicions.   Officer Slaughter did not testify at either of the trials in this case.

thirds of which occurred between approximately 7:30 a.m. and 6:00 p.m.  (Def. Ex.

3, admitted at Doc. 107, pp. 20-21).  It is common for burglars to be armed.  (Doc.

107, p. 127).  Captain Stringer testified that the conduct described in the dispatch

call indicated a potential burglary.  (Doc. 106, p. 30).

Officer Spence was the first police officer to arrive in the Hardiman Place

neighborhood to investigate the dispatch call.  The day was cold; the sky was clear.

(GX9; Doc. 105, pp. 6, 8, 16; Doc. 65, pp. 32, 36, 130).  Officer Spence saw a

male, later identified as Mr. Patel, walking northbound on the sidewalk near 110

Hardiman Place Lane wearing clothes that matched the description in the dispatch

call.  Officer Spence drove past the individual because the individual was not

African-American and was not at the address provided in the call.  As Officer

Spence drove past, he made eye contact with the individual (who appeared to

Officer Spence to be of Indian descent), and the individual turned and started

walking in the other direction.[13]  Officer Spence thought the individual's conduct

was indicative of suspicious activity, but Officer Spence continued driving toward

148 Hardiman Place Lane to see if he could locate an African-American male who

---

[13] By referring to Mr. Patel as "the male" or "the individual" at this juncture in the opinion, the
Court intends no disrespect to Mr. Patel.  Officer Parker's conduct must be judged by what he
knew in the moment when he took Mr. Patel to the ground.  On the morning of February 6, 2015,
none of the officers who responded to the check subject call knew who Mr. Patel was.  The
Court's use of the terms "the male" and "the individual" is consistent with this unknown state of
affairs.

fit the description in the dispatch call.  (Doc. 105, pp. 12, 19-20, 27-28; Doc. 65, pp. 30-31, 52, 67-68, 74).

As Officer Spence drove farther into the Hardiman Place neighborhood, Officers Slaughter and Parker arrived in the neighborhood.  (Doc. 105, p. 12; Doc. 65, p. 31).  Like Officer Spence, Officers Slaughter and Parker observed a male individual (who they later learned was Mr. Patel) walking on Hardiman Place Lane.  The individual was wearing an outfit that matched the description from dispatch, but he was not walking into yards or looking in garages; he was just walking on the sidewalk.  (Doc. 107, pp. 53-54).[14]  Officer Slaughter stopped the marked patrol car that he was driving a few feet behind the individual near 116

---

[14] In the Government's opening statement in the first trial of this case, counsel for the Government remarked:  "This grandfather has committed no crime; he has been accused of no crime; he has done nothing wrong."  (Doc. 65, p. 4).  In doing so, the Government opened the door to evidence that established that on February 6, 2015, Mr. Patel, a resident alien, violated 8 U.S.C. § 1304(e) when he left his son's house without identification.  (Doc. 65, pp. 140, 152-53).  That is a misdemeanor crime for which Officer Parker could have arrested Mr. Patel.  8 U.S.C. § 1304(e) ("Every alien, eighteen years of age and over, shall at all times carry with him and have in his personal possession any certificate of alien registration receipt card issued to him pursuant to subsection (d) of this section.  Any alien who fails to comply with the provisions of this subsection shall be guilty of a misdemeanor . . . ."); *United States v. Vasquez-Ortiz*, 344 Fed. Appx. 551, 555 (11th Cir. 2009) ("Vasquez-Ortiz's response – that he was from El Salvador and did not have any identification – coupled with the other surrounding circumstances, established reasonable suspicion and probable cause to believe that he was violating 8 U.S.C. § 1304(e)."); DOJ Criminal Resource Manual, Section 1918 (explaining that "a law enforcement officer confronting an alien who is unable to produce documentation arguably has probable cause to believe that a violation of 8 U.S.C. § 1304(e) . . . has occurred").  Because the evidence at the first trial ultimately demonstrated that Officer Parker did not consider this potential violation of the law when he assessed the totality of the circumstances, the Court did not instruct the jury in the first trial about this misdemeanor violation in the jury charge.  The Government did not open the door to this evidence in the second trial, so the jury in the second trial did not hear evidence concerning Mr. Patel's statutory violation.

Hardiman Place Lane, and Officer Slaughter activated the COBAN video system to record the interaction with the individual. (GX3; Doc. 105, pp. 12-13 (explaining COBAN system); Doc. 107, pp. 55-56, 73, 76). Officer Slaughter and Officer Parker walked toward the subject, approaching him from behind. (GX1, 0:13–0:16; Doc. 105, p. 54; Doc. 107, p. 75).[15]

Another factor that officers should consider when evaluating the totality of the circumstances concerning the use of force is the number of subjects and the number of officers. In making this comparison, officers must consider the relative size and strength of the subjects and the officers. (Doc. 106, pp. 49-50, 108, 138, 177-78). Here, there was one subject, and there were two officers. Officer Parker saw that the subject was older than he and Officer Slaughter. (Doc. 107, p. 94).[16] Officer Slaughter was new to the MPD and was in training. Consequently, he was

---

[15] GX1 is a video recording that the Government created by splicing together portions of the video from Officer Parker's patrol car and the video from Officer Spence's patrol car. The Government enhanced the video to improve the audio and video quality. (Doc. 105, pp. 13-14). The Court admitted GX1 at Doc. 105, p. 13. Despite the enhancements, the composite dashcam video omits details that are important to the use of force evaluation in this case. For example, Mr. Patel's hands are not visible in the video in the moments before Officers Slaughter and Parker began a pat down of Mr. Patel. (Doc. 106, pp. 48, 51, 73). The audio track of the enhanced video also is difficult to hear at times. The Government gave the jurors a transcript of the audio for the enhanced dashcam video to assist the jurors as they reviewed the recording during trial. The transcript is not evidence, but it was marked for purposes of identification as GX2. (Doc. 105, p. 13). The parties stipulated that "written transcripts of the audio portion of the patrol call videos and of the police dispatch call fairly and accurately reflect what is captured in the recordings." (Doc. 48; Doc. 105, p. 14). The Court has attached the Government's transcript of the enhanced dashcam video to this opinion as Appendix A.

[16] Eventually, the police learned that Mr. Patel was 57 years old. Officer Spence testified that Mr. Patel looked older than 57. (Doc. 105, p. 17; Doc. 65, p. 13).

not authorized to work alone. Officer Parker, age 27, was acting as Officer Slaughter's field training officer. A field training officer teaches new officers "how to apply the basics that are learned in the [police] academy to actual work on the street." (Doc. 106, p. 10). Officer Parker had been a field training officer for two months. When a field training officer is paired with an officer in training, the officer in training may serve as a second set of eyes and hands in a situation in which force is required, or an officer in training may increase the challenges in a use of force situation because the training officer is responsible for the safety of the trainee, and a trainee who is not helpful may cause a training officer to "have to work a lot harder to keep things safe" for himself and for the trainee. (Doc. 106, p. 103; Doc. 107, p. 107).[17]

As part of Officer Slaughter's training, Officer Parker had Officer Slaughter take the lead in the interaction with the suspicious subject.[18] Officer Slaughter called to the subject: "Hey, bud. Let me talk to you real quick. Come here. What's going on, sir?" (GX1, 0:16–0:19; GX2, p. 2; Doc. 107, p. 56). Through an

---

[17] Officer Spence arrived on the scene just as Officer Parker took Mr. Patel to the ground. Officer Parker was facing away from the street, so he did not see Officer Spence driving toward him and Mr. Patel. (GX1; Doc. 107, p. 75). Officer Parker testified that he knew that Officer Spence was in the area, but Officer Parker did not know how far away Officer Slaughter was. Consequently, Officer Parker did not know that Officer Spence was close enough and available to help when he made the decision to take Mr. Patel to the ground. (Doc. 107, pp. 52, 79-80).

[18] Officer Parker testified that as he and Officer Slaughter drove to Hardiman Place, they discussed the dispatch call and the fact that Officer Slaughter would take the lead if they located the suspicious person. (Doc. 107, pp. 49, 51, 56). The enhanced dashcam video shows that Officer Parker gave no verbal directions to Officer Slaughter during the encounter with Mr. Patel.

interpreter, Mr. Patel testified that when he saw Officers Slaughter and Parker, he knew that they were police officers because of the way they were dressed. (Doc. 105, pp. 54-55). The dashcam video recording confirms that Officers Parker and Slaughter were wearing uniforms, and they were walking toward Mr. Patel from a marked police car.

The enhanced dashcam video demonstrates that when Officer Slaughter called to the unidentified subject to "come here," the subject turned, waved, and walked a few steps toward Officer Slaughter. (GX1, 0:19–0:27; Doc. 106, p. 111). Mr. Patel testified that he did not understand what Officer Slaughter said when he called out, but he stopped and stated in English, "I am walking, walking." (Doc. 105, p. 55). Mr. Patel added that Officer Slaughter "asked me about my house and I said, 148, 148." (Doc. 105, p. 55). Neither the phrase "I am walking, walking," nor the statement "148, 148" can be heard on the audio track of the dashcam video recording, but some of Mr. Patel's statements are unintelligible or inaudible on the recording.[19] On the morning of February 6, 2015, Officers Slaughter, Spence, and Parker all asked Mr. Patel for his address both before and after the takedown. The enhanced dashcam video contains no evidence that Mr. Patel replied "148" to any of the questions posed to him about his address. (GX1, 0:51–0:52, 1:13–1:16,

---

[19] When the Court states that Mr. Patel's response to a question from Officer Slaughter was "unintelligible" or "inaudible," the Court uses the language provided in the Government's transcript of the enhanced dashcam video. (GX2, pp. 2-3, 5). The transcript does not contain the words "walking," "my house," or "148."

6:53–6:55, 7:04–7:06, 9:54–9:58; GX2, pp. 2-3, 7-9).  Officer Parker testified that during his interaction with Mr. Patel, Mr. Patel did not say where he lived.  (Doc. 107, p. 57).

The enhanced dashcam video demonstrates that the unidentified subject said "No English" in response to Officer Slaughter's initial questions.  The subject also said, "India," and repeated, "No English."  When Officer Slaughter asked the subject where he was headed, the subject reiterated, "India," and "No English." (GX1, 0:30–0:49; GX2, pp. 2-3; Doc. 106, p. 116; Doc. 107, p. 87).  Mr. Patel confirmed at trial that he made these statements to Officer Slaughter.  (Doc. 105, p. 55).  After stating, "No English" twice, the subject took two steps away from Officers Slaughter and Parker and stopped when Officer Slaughter said, "Hey, come here."  (GX1, 0:37–0:40; GX2, p. 2).

The enhanced dashcam video reveals that Officer Slaughter next asked additional questions about where the subject was going and where he lived.  The subject raised his arm and pointed, stated an unintelligible reply, and began to walk away for a second time.  (GX1, 0:49–0:57; GX2, p. 2; *see also* Doc. 106, p. 117). Mr. Patel testified at trial that he "did not try to run away, but I did back up a couple of steps to show them my house, my house."  (Doc. 105, p. 56).  The subject's movement away from the officers raised Officer Parker's alerts.  Officer

18

Parker believed that the subject did not want to cooperate in the investigation that Officer Slaughter was trying to conduct. (Doc. 107, pp. 57, 90).

Officer Slaughter called for backup (speaking into his radio "Code 1"), instructed the subject to stop walking away, and then asked the subject for ID (i.e., identification). (GX1, 0:54–0:59; GX2, p. 2; GX3; Doc. 105, p. 11; Doc. 65, pp. 56, 108). The subject stopped and responded, "No English." (GX1, 0:59–1:00; GX2, p. 2). Officer Slaughter continued, "What's your name?" (GX1, 1:00–1:02; GX2, p. 2). Officer Parker interjected, "He's saying, 'No English.' He doesn't understand what you're saying." (GX1, 1:02–1:04; GX2, pp. 2-3; Doc. 107, pp. 73-74, 88). The subject did not produce identification. (Doc. 107, p. 57).

When examining the totality of the circumstances concerning use of force, an officer may take into account the fact that an individual who is the subject of a suspicious person call disregards commands and walks away from officers. (Doc. 106, p. 181; Doc. 106, pp. 52-53). Officers are trained that armed subjects will be evasive and will refuse to answer questions. (Doc. 107, p. 100). In evaluating a subject's compliance with commands, an officer must consider the possibility that a person who indicates that he cannot speak English or otherwise has a challenge communicating may not understand an officer's commands, but police do not assume that a subject who states that he does not speak English (or experiences some other difficulty communicating) is telling the truth. (Doc. 106, pp. 54, 65-66,

143; Doc. 107, pp. 35, 57).   And when a subject indicates during an investigatory stop that he cannot speak English, an officer cannot walk away from the subject to go to his patrol car to call an interpreter if the officer is concerned that the subject may flee.  (Doc. 107, pp. 81-82; Doc. 65, pp. 60-61, 108-09).  Officers are trained that any barrier to communication, whether it is a language barrier or an impediment to communication like intoxication, makes an encounter more difficult and potentially more dangerous.  (Doc. 106, pp. 101, 123-24).  Thus, a language barrier must factor into an analysis of the totality of the circumstances concerning use of force, but it is not police procedure to allow someone who says "No English" during an investigatory stop to ignore commands, walk away, and not submit to an investigation.  (Doc. 105, p. 41; Doc. 106, p. 116; *see also* Doc. 106, p. 65; Doc. 107, pp. 38-39, 129).

Officer Parker testified that although the subject—Mr. Patel—stated that he did not understand English, Officer Parker did not believe him.  (Doc. 107, pp. 74, 88).  Officer Parker reasoned that when the subject did not answer questions, the subject was refusing to cooperate with the investigation and was being evasive.  (Doc. 107, p. 90).  Officer Parker stated that when the subject turned and began

walking away, "my alerts [went] up that this might be more than a check subject, that there might be more to it." (Doc. 107, p. 57).[20]

On the enhanced dashcam video, Officer Slaughter continued to pose questions to the subject, asking if he lived in the neighborhood and if he was looking at houses.  The subject gave unintelligible answers.  (GX1, 1:05–1:30; GX2, p. 3).  The enhanced dashcam video demonstrates that the subject pointed down the street again.  (GX1, 1:18–1:20).  Then, the subject turned and began to walk away from Officers Slaughter and Parker for a third time.  (GX1, 1:21–1:27).  Officers Slaughter and Parker followed the subject, and Officer Parker called out, "Sir?  Sir?  Come here."  (GX1, 1:24–1:27; GX2, p. 3).  Although he watched the enhanced dashcam video the morning before he testified at trial, Mr. Patel testified that he did not move.  (Doc. 105, pp. 55-57, 63-65).  He testified:  "I was just standing.  I did not move."  (Doc. 105, p. 57).

Officer Parker testified that as the subject was walking away, "he was putting his hands in his pocket."  (Doc. 107, p. 58).  Officer Parker stated that when the subject put his hands in his pockets as he walked away, he (Officer Parker) believed that the subject could be armed, and the farther the subject moved

---

[20]  Although Officer Parker consistently stated on February 6, 2015 and at trial that he did not believe Mr. Patel when Mr. Patel indicated that he did not understand English, as discussed below, the evidence relating to Officer Parker's beliefs about Mr. Patel's ability to speak English is not consistent.  At one point, Officer Parker said in a call to dispatch that Mr. Patel did not speak English.  Later, when Officer Parker was describing for Lieutenant Harrell the events leading to the takedown, Officer Parker said that Mr. Patel began to say his name but then refused to answer questions.  *See* pp. 75 and 76, below.

away, "the more he can either flee or he can react with, if he [is] reaching in his pocket to grab something and we can't do anything to solve it." (Doc. 107, pp. 58-59).

When examining the totality of the circumstances concerning use of force, an officer may take into account the fact that an individual who is the subject of a suspicious person investigation may be armed. (Doc. 106, pp. 50, 64, 139). Officers are trained that "hands are what kills you"; hands are "the most common personal weapon that a person uses"; and hands are "used to access any type of object that might be a weapon, not necessarily a knife or a gun." (Doc. 106, pp. 87-88; Doc. 107, p. 40; *see also* Doc. 106, pp. 35. 117-18). When police conduct an interview, they are in close proximity to a subject. If an officer cannot see a subject's hands, the officer does not know what the subject might do with his hands or what he might pull out of his pockets. (Doc. 107, pp. 40, 62, 98-99; *see also* Doc. 106, p. 181). Therefore, police are trained not to allow a suspicious subject to place his hands in his pockets. (Doc. 105, pp. 99-100). When police officers confront a reported suspicious person and that person puts his hands in his pockets, it is normal MPD procedure for the officers to conduct a pat down to determine what might be in the individual's pockets. (Doc. 105, p. 32; Doc. 107, p. 40; Doc. 65, p. 103). Police do so because pockets can be used to conceal weapons.

Because Officers Slaughter and Parker were standing between Mr. Patel and the dash camera as Mr. Patel walked away from the officers, the video does not indicate whether Mr. Patel placed his hands in his pockets. (GX1, 0:55–0:57; GX1, 1:18–1:25; Doc. 106, pp. 48-49). Mr. Patel testified generally that he did not move after the officers told him to stop, (Doc. 105, pp. 64-65), but he was not asked specifically whether he put his hands in his pockets. When Officer Parker met with Lieutenant Harrell on February 7, 2015 to review and discuss the dashcam video, Officer Parker told Lieutenant Harrell that the subject—Mr. Patel—put his hands in his pockets and refused to remove his hands from his pockets. (Doc. 105, pp. 102-03). The audio of the enhanced dashcam video contains no evidence that either Officer Slaughter or Officer Parker commanded Mr. Patel to take his hands out of his pockets, and Officer Parker acknowledges that he did not tell Mr. Patel to take his hands out of his pockets. (Doc. 107, p. 99).

Officer Parker testified that he took over the investigation when the subject walked away for the third time because he believed that Officer Slaughter was losing control of the situation. (Doc 107, pp. 60, 116).[21] Officer Parker walked around to face the subject to determine whether he could see the subject's hands. (GX1, 1:27–1:33; GX2, p. 3). The enhanced dashcam video demonstrates that

---

[21] In the written report that Officer Parker completed at the end of the day on February 6, 2015, Officer Parker wrote that Officer Slaughter was "stern and in control" when Officer Slaughter responded to a suspicious subject call. (Doc. 107, pp. 113-14).

Officer Parker then held the subject's hands behind his back, and Officer Slaughter began a pat down of the subject's pants. (GX1, 1:33–1:38; *see also* Doc. 106, p. 117; Doc. 107, p. 64; Doc. 65, p. 37). Officer Parker stated that he "grabbed [Mr. Patel's] hands out of his pockets and put them behind his back for a pat down or Terry frisk." (Doc. 107, p. 61). Mr. Patel testified that one of the officers was holding his hands behind his back, and both officers patted his pants. (Doc. 105, pp. 57-58). Mr. Patel did not respond aggressively when Officer Parker restrained his hands; Mr. Patel did not try to fight, head butt, or spit at the officers. (Doc. 106, pp. 146-47).

Officer Parker testified that he believed that a pat down was necessary because he was concerned that the subject might be armed "[d]ue to the indicators that he gave us of walking away, not giving us the answers we need, not cooperating with our investigation, keeping his hands in his pockets, all those are indicators that a subject could be armed." (Doc. 107, pp. 61-62; *see also* Doc. 107, pp. 69, 78, 96-97, 101, 116). Officer Parker stated that he also had to take into account the fact that Officer Slaughter, an inexperienced trainee officer, was out of position. (Doc. 107, pp. 111-12).[22] Officer Parker did not take into account the

---

[22] Captain Sanders, who trains police officers in Louisiana in use-of-force standards, opined that Officer Slaughter was acting appropriately because he and Officer Parker were in a "combat L" position. (Doc. 106, p. 50). Captain Sanders testified: "Nobody knows how to do that unless they have been through some basic police officer training, hence the letter L. [Officer Slaughter] knows enough about taking up formations to know how to keep himself safe." (Doc. 106, p. 51). None of the MPD police officers who were asked about the "combat L" formation knew what a

fact that Mr. Patel said, "no English." Officer Parker stated, "I just needed to make sure he was not armed." (Doc. 107, p. 62). Captain Sanders, the Government's use-of-force expert, testified that he does not believe that Officers Parker and Slaughter violated police standards when they used a pat down during their investigation of Mr. Patel. (Doc. 106, p. 59).

Officer Parker testified that during the pat down, Mr. Patel jerked away three times, and each time, Officer Parker gave a loud verbal command. (Doc. 107, pp. 66, 75-76). The enhanced dashcam video demonstrates that as Officers Parker and Slaughter were attempting to pat down Mr. Patel, Officer Parker said in a loud voice:

> Stop. Do not jerk away from me again. If you do, I'm going to put you on this ground. Do not jerk away from me one more time. Do you understand? Do you understand what I'm saying to you? Do not jerk away from me again. Wait a second.

(GX1, 1:38–1:52; GX2, p. 3).

When evaluating the totality of the circumstances concerning use of force, an officer may consider whether a suspicious subject resists during a pat down. (Doc. 106, p. 139). If a subject does not resist, then a takedown during a pat down

---

"combat L" formation was. Officer McCullars, the police academy officer who trained Officer Parker, testified that Alabama officers are not taught a "combat L" position. (Doc. 106, pp. 94-95). Captain Sanders acknowledged that he does not know whether Officer Parker was trained in the "combat L" position. (Doc. 106, p. 60). On a related note, Captain Sanders stated that a force continuum is still taught in police training. (Doc. 106, p. 58). Captain Stringer and Sergeant Bray testified that MPD officers are not trained in a force continuum. (Doc. 106, pp. 16, 174). Captain Sanders has not trained a police officer in Alabama. (Doc. 106, p. 56).

is not appropriate. (Doc. 106, p. 118). But resistance may call for the use of force. MPD's written "Response to Resistance" policy states that an officer may use that amount of non-deadly force reasonably necessary to "overcome resistance or enforce compliance as quickly as possible in anticipation of and/or to prevent the escalation of resistance." (GX26, p. 2). In addition,

> Situations involving a response to resistance are dynamic events which require split-second decision making by the officer(s) on the scene regarding the type and amount of force deployed. It is important to understand that use of force policy and training not be based on strict rules that amount to a "by the numbers" mechanical application. No policy can predict all of the circumstances that may be encountered by officers in the filed [sic].

> Nothing in this policy requires an officer to hesitate or actually sustain physical injury before applying reasonable force.

(GX26, p. 1; *see also* Doc. 106, p. 20). Officer Spence acknowledged that when a police officer encounters a suspect during a preliminary investigation, the officer usually conducts a pat down of the suspect, and the officer has a reason to use force if the suspect jerks away from the officer during a pat down. (Doc. 105, pp. 31-32).

MPD officers are trained that there are different levels of resistance. Passive resistance occurs when a subject refuses to follow an officer's verbal commands, to speak, to show hands or remove hands from pockets, or to stop. (Doc. 106, pp. 26, 89; *see also* Doc. 106, p. 181). Active or defensive resistance occurs when a subject uses physical resistance to prevent an officer's actions. (Doc. 106, p. 90).

26

This includes pulling away from an officer, turning to face an officer when an officer is holding the subject's hands behind his back, or refusing to submit to a pat down search. (Doc. 106, pp. 27-28, 90; *see also* Doc. 106, pp. 60-61). Police officers are trained that a subject's failure to allow himself to be placed at a disadvantage to an officer is a significant indication of resistance. (Doc. 106, p. 84).

Police are also trained that there are different zones of contact between officers and subjects. The personal contact zone, a distance of six feet or less between an officer and a subject, is the most dangerous zone of interaction for a police officer because that is the zone in which an officer "can be assaulted and be struck." (Doc. 106, pp. 33-36). Because of the difficulty of reading a suspect's intentions or reacting to a suspect's movements when the suspect is near, MPD officers are taught in SSGT training[23] that they must control a subject who is in the personal contact zone, and they must control the subject's hands "so that they do not let someone get an advantage over them." (Doc. 106, pp. 34, 132). In addition, officers are instructed in SSGT training that when they are in the personal zone of contact with a subject, they must give loud, clear verbal commands. An officer necessarily must be in the personal contact zone to conduct a pat down. (Doc. 106, pp. 86-87). The enhanced dashcam video demonstrates, and trial

---

[23] "SSGT" stands for "strategic self-defense grappling tactics." (Doc. 106, p. 11).

testimony confirms, that Officer Parker and Mr. Patel were in the personal contact zone when Officers Parker and Slaughter began to pat down Mr. Patel's pants. (GX1, 1:30–1:37; Doc. 106, pp. 33, 179; Doc. 107, pp. 61-65).

Officer Parker attempted to restrain both of Mr. Patel's hands with his right hand while he used his left hand to pat Mr. Patel's left pocket. (Doc. 107, pp. 61-65, 106-07). Officer Parker testified that he only had control of Mr. Patel's pointer fingers. (Doc. 107, p. 64). Officer Matthew McCullars, an instructor at the Northeast Alabama Law Enforcement Academy who conducted part of Officer Parker's academy training, testified that it can be "exceptionally difficult" if a subject resists when an officer tries to secure the subject's hands with one hand, without using handcuffs, and conduct a frisk with the other hand. (Doc. 106, p. 117-18). While Officer Parker restrained Mr. Patel's hands, Officer Slaughter conducted a pat down of Mr. Patel's right leg and then stepped aside. (GX1, 1:35–1:42; Doc. 107, pp. 61-65, 106-07). After Officer Parker commanded, "Do not jerk away from me again. Wait a second," Officer Parker began patting down Mr. Patel's left pocket. (GX1, 1:51–1:55). Officer Slaughter told Mr. Patel to "Sit tight. Relax. Relax." (GX1, 1:52–1:55; GX2, p. 3).

Officer Parker testified that while he was trying to pat one of Mr. Patel's legs, Mr. Patel "jerked away for the fourth time" and "his left hand went free." (Doc. 107, pp. 66-67; *see also* Doc. 107, pp. 76-78). Officer Spence arrived as this

happened.  Because Officer Parker had his back to the street and was between the dashcam in Officer Spence's car and Mr. Patel, the enhanced dashcam video from Officer Spence's patrol car does not demonstrate whether Officer Parker lost his grip on one of Mr. Patel's hands.  (GX1, 1:55–1:57; Doc. 105, p. 15; Doc. 107, p. 95).  Officer Spence testified, "it looked like Mr. Patel's elbow went back, but I wasn't in a position to see exactly what was going on" or why the elbow moved.  (Doc. 105, pp. 15, 30).[24]

Mr. Patel testified that he did not understand Officer Parker when Officer Parker told him to stop jerking away.  (Doc. 105, p. 58).  He also testified that he was not trying to pull away or resist or escape.  (Doc. 105, p. 58).  When Mr. Patel was asked at trial if, while the officers had his hands behind his back, he tried to turn and look at one of the officers, Mr. Patel replied, "No."  (Doc. 105, p. 64).  When asked if, while the officers had his hands behind his back, he tried to take a step away, Mr. Patel responded, "No, I was just standing still."  (Doc. 105, p. 64).

The Government introduced four enhanced video clips from the COBAN video recording from Officer's Spence's car.  The four enhanced video clips capture the five seconds leading up to and including the takedown.  Two of the videos are slowed to 50% of the original speed; two are slowed to 25% of the

---

[24] During the first trial, Officer Spence confirmed that on February 6, 2015, he completed a report in which he stated that Mr. Patel's right elbow appeared to be loose near the time that Officer Parker took Mr. Patel to the ground.  (Doc. 65, p. 62).

original speed; and two of the videos (one at each speed) are resized to zoom in on Officer Slaughter, Officer Parker, and Mr. Patel.  Mr. Patel's right elbow is not visible in any of these videos, but each of these enhanced videos reveals that in the seconds before Officer Parker took Mr. Patel to the ground, Mr. Patel turned his head back over his left shoulder to look at Officer Parker, and Mr. Patel moved his left foot toward the left and backwards as his head turned toward Officer Parker. (GX5–GX 8, admitted at Doc. 105, p. 20).[25]

Officer McCullars reviewed the dashcam video a number of times before trial at the Government's request, and he reviewed both the enhanced recording and one of the slow motion recordings during trial.  (Doc. 106, pp. 83, 92-93). Officer McCullars testified that the movement of Mr.  Patel's feet was visible in the slow motion recording, and that movement was an indicator of potential passive resistance because "[p]eople will often shift their feet in order to change their stance to set a path for fleeing."  (Doc. 106, p. 93; *see also* Doc. 106, p. 120). Officer McCullars also testified that officers are trained at the police academy "that controlling a subject is a very important part of their tasks when they're investigating someone for any kind of possible criminal activity or answering a call

---

[25]  Officer Spence recalled seeing Mr. Patel turning, but Officer Spence testified that he thought Mr. Patel was turning to the right.  (Doc. 105, p. 30).  The enhanced video clips confirm that Mr. Patel turned to his left.

. . . we want [officers] to control the situation and prevent it from escalating out of control." (Doc. 106, pp. 80-81, 86, 102).

Captain Sanders, the Government's expert, opined that the fact that Mr. Patel walked away from Officers Parker and Slaughter a number of times was not really resistance. (Doc. 106, p. 52-53). On cross-examination, Captain Sanders acknowledged that he could see in the dashcam video that Mr. Patel engaged in some of the levels of resistance that are described in the SSGT training manual. (Doc. 106, pp. 67-68).[26]

MPD officers are trained to take a subject to the ground to gain better control over a subject. (Doc. 106, pp. 90-91). Captain Stringer acknowledged that when an officer encounters resistance, the officer must make a split-second decision about how to handle the resistance. In those dynamic situations, an officer may adapt and improvise and do what the officer believes is reasonably necessary under the circumstances to control the situation. (Doc. 106, p. 24). Officer Parker testified that he made the decision to take Mr. Patel to the ground

---

[26] Captain Sanders is the senior master instructor for the Louisiana Regional Police Academy. Captain Sanders also trains other police academy instructors for the Federal Law Enforcement Training Agency. Captain Sanders is not a certified SSGT trainer. He is familiar with SSGT only through his review of the student SSGT training manual. (Doc. 106, pp. 41, 44, 56, 59, 67-68). Officer Parker received sixteen hours of level 1 SSGT training at the police academy. Officer Parker received no additional SSGT training from the MPD. (Doc. 106, pp. 130-31; Doc. 107, p. 6). Annual recertification in SSGT is encouraged in part to reduce the number of circumstances in which an officer would feel the need to improvise and use an unvetted technique to control resistance. The use of vetted techniques helps to maintain a low injury rate for the officers using force and the subjects upon whom force is used; however, as long as officers act reasonably, officers are allowed to improvise and adapt their training to the particular circumstances facing them. (Doc. 106, pp. 134-35).

because "I couldn't control his hands enough to hold on to him, so I couldn't control him to handcuff him.  So the only way I could control him is if I put him at a disadvantage and put him on the ground." (Doc. 107, p. 79).  In addition, police are trained not to allow a subject to face an officer while the officer conducts a pat down, so Officer Parker had "to control that situation of [Mr. Patel] turning." (Doc. 107, p. 104).  Officer Parker stated, "if he's pulling away while I think he has a weapon, my concern is that he's going for that weapon." (Doc. 107, p. 103).

MPD officers are trained that the level of force used to control a subject should be proportional to the level of a subject's resistance and reasonable in light of the totality of the circumstances.  (Doc. 106, pp. 27, 106-07, 127, 138; Doc. 107, p. 37).  Captain Stringer testified:  "Madison police officers are expected to use that amount of force which is reasonably objective to accomplish lawful objectives." (Doc. 106, p. 13; *see also* Doc. 106, p. 16; GX26, p. 2).  Lawful objectives include controlling a subject and maintaining officer safety.  An officer may not use force to punish someone or to teach someone a lesson; neither would be a lawful objective.  Officers are trained that they do not have to hesitate to use force to accomplish lawful objectives.  (Doc. 106, pp. 23, 126; *see also* Doc. 106, p. 145).  And the amount of force that is reasonably necessary to accomplish a lawful objective must be evaluated based on the totality of the circumstances and everything an officer knows about the incident in which he is involved.  (Doc. 106,

p. 21; *see also* Doc. 106, pp. 176-77).  Use of a higher level of force is more likely to cause a serious injury.  (Doc. 106, p. 106).[27]

Officer Parker took Mr. Patel to the ground as Officer Slaughter stood to the side with his hands folded in front of him.  (GX1, 1:56–1:57; Doc. 105, p. 15; Doc. 65, pp. 43-44).  Officer Parker testified that as he began to take Mr. Patel to the ground, he pulled Mr. Patel forward toward the grass to avoid the concrete sidewalk "to keep [Mr. Patel] from being hurt."  (Doc. 107, p. 68).  Officer Parker stated that as he pulled Mr. Patel toward the grass, he (Officer Parker) placed his weight on his right leg, and he lost his balance and fell with Mr. Patel.  (Doc. 107, pp. 67, 124).  The dashcam video confirms that Officer Parker put Mr. Patel down on the grass rather than on the sidewalk.  (GX, 1:56–2:00; GX 5).  Although Mr. Patel fell on a grass lawn, the ground was cold, and Mr. Patel hit the ground hard, face-first.  (GX1, 1:56; Doc. 105, pp. 16-17, 59; Doc. 65, p. 45).  Because Officer Parker was still holding Mr. Patel's hands behind his back, Mr. Patel could not break his fall.

Some of the MPD officers who watched the dashcam video testified that Officer Parker used a leg sweep to take Mr. Patel to the ground.  (Doc. 105, p. 93;

---

[27]  In the first trial in this case, Officer Spence testified that officers are "trained to take people down safely for officer safety."  (Doc. 65, p. 45).  When the Government's attorney asked if officers were trained to consider the safety of a subject, Officer Spence replied:  "I can't testify to that, sir. We're trained to take the people down. We understand injuries happen." (Doc. 65, p. 45).  In training, officers learn that officers who hesitate are officers who "get killed." (Doc. 65, p. 65).

Doc. 106, p. 52).   A leg sweep is not a technique that is taught at the police academy that Officer Parker attended.  (Doc. 106, pp. 18, 101-02, 122, 151, 155, 172; Doc. 107, pp. 36, 67, 124; Doc. 66, pp. 63-66; Doc. 67, pp. 58-59, 68-73; Doc. 69, pp. 93-97).[28]  Captain Stringer testified that what he saw in the dashcam video was not consistent with MPD policy because he "didn't see what appeared to be resistance" from Mr. Patel, such that "[t]he amount of force that was used at the time didn't meet the level of any resistance that might have been offered."  (Doc. 106, p. 18).  Captain Sanders, the Government's use-of-force expert, testified that the technique that Officer Parker used was not consistent with prevailing police standards.  (Doc. 106, p. 47).  Based on the motion of Mr. Patel's body, Captain Sanders opined that Officer Parker must have kicked Mr. Patel's feet out from under him.  (Doc. 106, p. 52).  Captain Sanders stated that the technique that Officer Parker used was violent, and there were less violent techniques that Officer Parker could have used to control Mr. Patel.  (Doc. 106, p. 49).

Other officers who supervised Officer Parker or who participated in his training as an MPD officer and who watched the video testified that what they saw

---

[28]   In the first trial in this case, Officer Spence testified that Officer Parker used a "standard takedown" that is taught at the police academy.  (Doc. 65, pp. 44, 49).  Because Officer Spence attended the police academy more than 15 years ago, it is possible that a "standard takedown" was part of the curriculum at the academy years ago.  The record establishes that the maneuver that Officer Parker used was not taught while Officer Parker was in the academy, and it is not part of the academy's current curriculum.  Captain Sanders testified that he had never seen the technique that Officer Parker used.  He called the technique a "lumberjack."  (Doc. 106, p. 47).

in the video did not violate MPD policy.  (Doc. 106, pp. 170, 175; Doc. 107, pp. 13, 30, 33-34).  Sergeant Bray testified that Officer Parker complied with MPD's use of force policy because he used objectively reasonable force.  (Doc. 106, pp. 170, 174).  Sergeant Bray stated that when he viewed the dashcam video, he saw Officer Parker put his left hand on Mr. Patel's shoulder, "and they both were losing their balance and falling completely forward at the will of gravity."  (Doc. 106, p. 173).  If an officer holds a subject's hands behind his back and fails to control a takedown, the subject will land somewhere on the front of his body—possibly on his face, his chest, or his abdomen.  (Doc. 106, p. 121; *see also* Doc. 105, pp. 15-16, 59; Doc. 65, pp. 45-46, 133).  Mr. Johnny Lee Smith, the defendant's expert who developed SSGT training, testified that he watched the video of the interaction between Officer Parker and Mr. Patel more than 100 times, and other than the technique used by Officer Parker to take Mr. Patel to the ground, Mr. Smith did not see Officer Parker do anything that was contrary to SSGT training.  (Doc. 106, pp. 135-36).  Mr. Smith's description of the takedown is similar to Sergeant Bray's description.  (Doc. 106, p. 155).  At trial, Officer Parker denied that he performed a leg sweep when he took Mr. Patel to the ground or that he intentionally kicked Mr. Patel.  (Doc. 107, pp. 67, 122-23, 125).  Officer Parker has no training in or experience with martial arts.  (Doc. 106, pp. 151, 154; Doc. 107, p. 67).

Counsel for the Government asked Officer Parker why he did not ask Officer Slaughter to grab Mr. Patel's right arm to control Mr. Patel. Officer Parker responded that doing so could put him in danger. Officer Parker testified that police do not communicate their plans verbally to one another in the presence of a subject because upon hearing the plan, a subject could react and endanger the officer. In Officer Parker's words: "it's safer to make sure we do not point out everything we're doing to the subject." (Doc. 107, p. 118-20). The enhanced dashcam video confirms that other than the one time that Officer Parker stated to Officer Slaughter "He's saying no English. He doesn't understand what you're saying," Officers Parker and Slaughter did not communicate verbally during their encounter with Mr. Patel.

Sometime later on February 6, 2015, the police learned that Mr. Patel had moved to the United States only a few days before his encounter with Officers Parker and Slaughter. Mr. Patel was living with his son at 148 Hardiman Place Lane. On the morning of February 6, 2015, Mr. Patel left his son's house to go for a walk. (Doc. 105, p. 53).

### B. Analysis

From this evidence, the Government argued that the force that Officer Parker used against Mr. Patel was unreasonable. (*See* Doc. 107, pp. 147-53). The Government told jurors that they should consider that on February 6, 2015, Mr.

Patel simply went outside to take a walk.  (Doc. 104, p. 10).  Days earlier, Mr. Patel had moved to the United States from India, and Mr. Patel was living with his son's family.  As Mr. Patel was leaving his son's house, a neighbor saw Mr. Patel and called the police because the neighbor did not recognize Mr. Patel.  The neighbor reported that an unfamiliar black man was walking into yards, standing in driveways, and looking into garages, and the neighbor felt nervous about leaving his wife and child at home by themselves while the man was walking around the neighborhood.  The police dispatcher issued a "check subject" call—not a crime in progress call—for a black male wearing a toboggan hat, white sweatshirt, and jeans who was walking in yards, standing in driveways, and looking in garages near 148 Hardiman Place.  Officers Slaughter, Parker, and Spence responded to the "check subject" call.

The evidence allowed the Government to argue that Officer Spence arrived first in the Hardiman Place neighborhood and drove past Mr. Patel because although Mr. Patel was wearing the articles of clothing described in the dispatch call, he was not walking into yards or looking into garages, and he was not African-American.  When Officers Slaughter and Parker arrived, even though Mr. Patel was doing nothing more than walking down the sidewalk, Officers Parker and Slaughter decided to stop Mr. Patel because Mr. Patel mostly fit the description in the "check subject" call.

The evidence supported the Government's argument that when Officer Slaughter called out to Mr. Patel so that Officer Slaughter could ask some questions, Mr. Patel did not run from the police or ignore them. Instead, Mr. Patel's behavior was friendly; he turned, waved, and walked toward the officers. (Doc. 112, p. 2). Mr. Patel did not understand the questions that Officer Slaughter asked, but he did his best to communicate to the police that he was from India and that he lived at 148 Hardiman Place Lane. Officer Slaughter ignored the fact that Mr. Patel repeatedly said, "No English" and continued to press Mr. Patel for answers to his questions. (Doc. 107, p. 150; Doc. 112, p. 2). Officer Parker understood that Mr. Patel did not speak English because he said to Officer Slaughter, "He's saying 'No English.' He doesn't understand what you're saying"; but Officer Parker made no attempt to address the language barrier. (Doc. 107, p. 150).

The Government argued that Mr. Patel nevertheless attempted to communicate. He pointed towards his son's house and turned to walk in that direction. (Doc. 112, p. 2). When Officer Slaughter instructed him to stop, Mr. Patel complied immediately. And there is no evidence from the dashcam video that Mr. Patel placed his hands in or near his pockets before Officer Parker took over and restrained Mr. Patel's arms behind his back. (Doc. 107, p. 169). When Officer Slaughter started to pat down Mr. Patel's pants, Mr. Patel stood quietly.

He did not try to head butt Officer Parker or spit in his face.   The enhanced dashcam video reveals no sudden, aggressive jerking movements or attempts at flight.   (Doc. 107, p. 169).   Nevertheless, Officer Parker yelled at Mr. Patel to "stop jerking away."   Officer Parker angrily threatened to "put [Mr. Patel] on the ground" if Mr. Patel did not stop jerking away.   Mr. Patel did not understand what Officer Parker was saying to him, but he testified that he did not move.   (Doc. 112, p. 2).   The Government argued that perhaps out of frustration or perhaps to act tough for Officer Slaughter, Officer Parker took Mr. Patel to the ground.   (Doc. 107, pp. 168-69).   Without further warning and without enlisting Officer Slaughter's assistance, Officer Parker kicked Mr. Patel's legs out from under him, causing Mr. Patel to fall to the frozen ground.   The Government added that because Officer Parker held Mr. Patel's hands during the takedown maneuver—a maneuver which Officer Parker eventually acknowledged constituted a leg sweep—Mr. Patel was unable to use his hands and arms to break his fall, and his face and neck absorbed the impact of the collision with the hard ground.   (Doc. 112, pp. 2-3).   Mr. Patel suffered a bloody nose, and the neck trauma caused Mr. Patel to experience paralysis.   (Doc. 107, p. 147).   The Government argued that Officer Parker had to have known that Mr. Patel would suffer an injury if he restrained Mr. Patel's hands while throwing him violently to the ground.   (Doc. 107, pp. 148, 169).

The Government suggested that if Officer Parker believed that he needed to control Mr. Patel, a small, elderly man who had committed no apparent crime in the presence of Officers Parker and Slaughter, an officer in Officer Parker's position had a variety of options short of a takedown that he could use. Officer Parker could have asked Officer Slaughter to restrain Mr. Patel while Officer Parker contacted a translator to improve communications. Officer Parker could have asked Officer Slaughter to restrain Mr. Patel's hands while Officer Parker applied handcuffs. Officer Parker could have waited for Officer Spence to arrive, and then the three officers easily could have controlled Mr. Patel. And Officer Parker could have allowed Mr. Patel to walk away, given the fact that Mr. Patel appeared to simply be taking a walk. Two MPD officers, Captain Stringer and Officer Spence, and Captain Sanders, an expert in national use-of-force standards, testified that the amount of force that Officer Parker used was not proportionate to the level of resistance that they saw in the Government's enhanced dashcam video. (Doc. 107, pp. 150-52; Doc. 112, p. 2).

Moreover, the Government argued, Officer Parker's post-incident assertion that he had to take Mr. Patel to the ground because Mr. Patel would not remove his hands from his pockets is not credible because neither Officer Parker nor Officer Slaughter directed Mr. Patel to remove his hands from his pockets. (Doc. 107, p. 169). The enhanced dashcam video does not reveal whether Mr. Patel ever placed

his hands in his pockets, but even if he had, two young officers easily could have controlled an elderly grandfather, removed his hands from his pockets, and completed a pat down to confirm that Mr. Patel was not armed.

Thus, the Government argues that it proved beyond a reasonable doubt that Officer Parker's use of a violent leg sweep to subdue Mr. Patel was excessive by established national standards for use of force.  If the Government's strongest case accounted for all of the relevant evidence introduced at trial, two juries might not have become deadlocked over the issue of Officer Parker's guilt.  But jurors in both trials apparently had, as any reasonable juror would have on the record in this case, reasonable doubt about the reasonableness of the force that Officer Parker used to control Mr. Patel.  The Court instructed the jury that "[w]hether a specific use of force is reasonable or unreasonable depends on the totality of the facts and circumstances of each case," and the Government's best case ignores many of the significant, relevant circumstances that were pertinent to the takedown of Mr. Patel.

For starters, although hindsight reveals that Mr. Patel was simply taking a walk on the morning of February 6, Officers Parker and Slaughter did not know that when they arrived in the Hardiman Place neighborhood.  The officers did not know who Mr. Patel was, where he lived, or why he was walking down the street on Hardiman Place Lane.  From the officers' point of view, they encountered an

41

unidentified man who generally fit the description that a known caller provided of an individual who had been walking into yards and looking into garages.  Every MPD officer who testified about the subject—Captain Stringer, Lieutenant Harrell, Officer Spence, and Officer Parker—agreed that the information contained in the MPD dispatch "check subject" call raised the suspicion of a burglary.  The evidence demonstrates that there were nearly 100 burglaries in Madison in the three months before February 6, and the majority of those burglaries occurred between 7:30 a.m. and 6:00 p.m.  Although Mr. Patel was just walking down the sidewalk when Officers Spence, Parker, and Slaughter saw him, the officers did not know whether Mr. Patel was casing homes for a future burglary or whether he may have committed a crime before the officers arrived.  Captain Sanders, the Government's expert on use of force, acknowledged that Officers Parker and Slaughter had reasonable suspicion to conduct a preliminary investigation, and Captain Stringer testified that based on the information provided in the check subject call, the officers had an obligation under MPD policy to conduct an investigation.

The record demonstrates that under MPD policy, an individual is not free to walk away from a preliminary investigation.  MPD policy requires an officer conducting a preliminary investigation to "make sure the scene is safe, make sure they can safely proceed with the preliminary investigation, identify witnesses [and]

suspects, and attempt to document who they are."  An officer must, to the extent possible, identify the suspicious individual, determine where the individual lives, and find out what the individual is doing and why he is in a particular area.

The evidence demonstrates that an officer is not excused from the obligation to investigate, and a subject is not excused from complying with a preliminary investigation, simply because the subject reports to an officer that he does not speak English.  It takes little imagination to conceive of the potential for abuse of a rule that would require officers to allow a subject who reports that he does not speak English to walk away from an investigation.  Reasonable jurors would reject the notion that officers responding to a report concerning a suspicious person should allow the person to walk away if the person says "No English," particularly when that person is unable to produce identification or respond to questions that officers ask him.

Regarding communication, the evidence related to Mr. Patel's ability to speak and understand English is very much disputed.  With respect to Mr. Patel's ability to speak English, Mr. Patel testified that when he encountered Officers Parker and Slaughter, he told them "walking, walking."  If he made this statement, it is not discernable on the Government's enhanced dashcam video, and it does not appear in the transcript that the Government prepared based on the audio track of the video.  And if Mr. Patel actually told Officers Parker and Slaughter that he was

"walking, walking," then Officers Slaughter and Parker—indeed any reasonable officer—would have reason to suspect that Mr. Patel was being dishonest and evasive when he repeatedly said "No English."  Mr. Patel's testimony about his ability to understand English is even more difficult to reconcile because it is internally inconsistent.  For example, Mr. Patel testified that he did not understand the commands that Officer Slaughter gave, but he contradicted himself, testifying that when Officer Slaughter asked him about his house, he replied "148, 148." Moreover, the enhanced dashcam video demonstrates that when Officer Slaughter called to Mr. Patel, saying, "Hey, bud.  Let me talk to you real quick.  Come here . . . ," Mr. Patel turned and walked toward Officers Slaughter and Parker.  Again, when Mr. Patel first began to walk away from Officers Slaughter and Parker, the video demonstrates that he stopped when Officer Slaughter commanded, "Stop."

A reasonable officer witnessing these signs of compliance with direct commands would be suspicious of a subject's report of "No English."  Trial testimony indicates that Mr. Patel had the opportunity to become familiar with simple English commands like "stop" and "come" because Mr. Patel had visited his son in Alabama twice before Mr. Patel moved to the United States, the more recent visit lasting eight months.  Officer Spence's statements to medics following the takedown demonstrate that he was not convinced that Mr. Patel did not understand English, and although Officer Parker's statements following the

44

takedown are inconsistent with respect to Mr. Patel's inability to speak English, he never veered from his position that he did not believe Mr. Patel when Mr. Patel indicated that he did not understand English.[29]

Importantly, the issue here for jurors was not whether Mr. Patel actually could or could not understand English. The issue was whether a reasonable officer evaluating the totality of the circumstances concerning use of force would question whether Mr. Patel legitimately could not understand English or whether Mr. Patel made an excuse in an attempt to avoid an investigation. The evidence shows that based on his training, although Officer Parker had to consider that Mr. Patel might have a genuine language barrier, he also had to consider that Mr. Patel might be evading the officers' investigation. The record establishes that officers are trained that armed subjects will be evasive and will refuse to answer questions.

The evidence demonstrates that the suspicion that Officer Parker had about Mr. Patel was heightened when Mr. Patel tried to walk away from the investigation. Officer Parker testified that when Mr. Patel walked away the first time, "my alerts go up that this might be more than a check subject, that there might be more to it." In addition to being suspicious in their own right, Mr. Patel's repeated retreats from the officers limited the options for surmounting the language barrier. The dashcam video contradicts Mr. Patel's adamant testimony that he

---

[29] *See* pp. 75-76, 85-86 below.

walked away from the officers only once and he took only two steps, evidence that is particularly damaging to Mr. Patel's credibility because the record demonstrates that counsel for the Government showed Mr. Patel the enhanced dashcam video the morning before he testified, and that video confirms that Mr. Patel walked away three times before the takedown. Mr. Patel may not have understood the questions that the interpreter was conveying to him, or Mr. Patel simply may not want to acknowledge that he walked away more than once and took more than two steps. In either case, his incredible testimony undercuts not only his assertion that he did not walk away from the police but also his testimony that he did not jerk his arms away from Officer Parker while Officer Parker tried to restrain his hands for a pat down.[30]

As to the pat down, Captain Sanders, the Government's own expert testified that the officers' decision to conduct a pat down did not violate police standards. Officer Spence testified that pat downs were not unusual during preliminary investigations. Because the Government's own evidence establishes that the pat

---

[30] A "jury has exclusive province over the credibility of witnesses, . . . unless [testimony] is 'incredible as a matter of law.'" *United States v. Feliciano*, 761 F.3d 1202, 1206 (11th Cir. 2014) (quoting *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999)). "Testimony is only 'incredible' if it relates to 'facts that the witness could not have possibly observed or events that could not have occurred under the laws of nature.'" *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009) (quoting *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997), holding modified by *United States v. Toler*, 144 F.3d 1423 (11th Cir. 1998)). Perhaps it is more a law of technology rather than a law of nature, but the Court finds on the basis of the Government's enhanced video that Mr. Patel could not possibly have walked away from the officers only once, and he could not have taken only two steps, given the video evidence and the fact that counsel for the Government reviewed the video with Mr. Patel before Mr. Patel testified. Mr. Patel's testimony on this point is incredible as a matter of law.

down was reasonable, MPD's "Response to Resistance" policy authorized Officer Parker, in the event of resistance during the pat down, to use that amount of force reasonably necessary to "overcome resistance or enforce compliance as quickly as possible in anticipation of and/or to prevent the escalation of resistance."

The slow motion clips from the Government's enhanced dashcam video supply objective evidence of resistance. The clips show that immediately before Officer Parker took Mr. Patel to the ground, Mr. Patel took a step to the side with his left foot and turned to face Officer Parker. Every police officer who was asked, including Captain Stringer, Captain Sanders, and Officer McCullars, agreed that a subject who turns to face an officer during a pat down while the officer and the subject are in the personal contact zone—the most dangerous contact zone—indicates resistance. Officer Parker's loud commands to Mr. Patel to stop jerking away indicate that Officer Parker at least perceived that Mr. Patel was jerking away from him. Officer Parker testified that Mr. Patel tried to jerk his hand away four times, and he succeeded on the fourth try. Officer Spence testified that as he drove up, he saw Mr. Patel's elbow move. Again, the officers who testified at trial acknowledged uniformly that jerking away from an officer, like turning to face an officer during a pat down, is an act of resistance.

MPD's "Response to Resistance" policy did not dictate a particular level of force for Officer Parker's consideration as he determined the amount of force to

use to overcome Mr. Patel's resistance and control the situation before it escalated.

Rather, the policy states:

> Situations involving a response to resistance are dynamic events which require split-second decision making by the officer(s) on the scene regarding the type and amount of force deployed.  It is important to understand that use of force policy and training not be based on strict rules that amount to a "by the numbers" mechanical application.  No policy can predict all of the circumstances that may be encountered by officers in the filed [sic].

> Nothing in this policy requires an officer to hesitate or actually sustain physical injury before applying reasonable force.

A number of MPD officers testified that Officer Parker's use of force complied with MPD policies, and Officer Parker's expert testified that other than technique, Officer Parker's use of a takedown complied with SSGT use-of-force training.

As for the takedown itself, the trial testimony is uniform:  Officer Parker did not use a technique that he learned at the police academy.   Neither the Government's expert nor Officer Parker's expert could name or identify the technique that Officer Parker used.  There is considerable dispute about whether Officer Parker used a technique at all.   Sergeant Bray testified that when he reviewed the dashcam video, he saw Officer Parker put his left hand on Mr. Patel's shoulder and then lose his balance, causing both Officer Parker and Mr. Patel to fall together to the ground.  Officer Parker testified that he did not perform a leg sweep, and he stated that he lost control of Mr. Patel as he was trying to take him to the ground so that both he and Mr. Patel fell together.  Officer Parker's attempt

to execute a controlled takedown quickly went awry, causing both Mr. Patel and Officer Parker to fall under the force of gravity rather than any force that Officer Parker applied.

The presence of Officer Slaughter on the scene did little to change Officer Parker's calculation of the threat posed by Mr. Patel or Officer Parker's ability to properly execute a takedown designed to gain control over Mr. Patel. The evidence establishes that a trainee may either be a second set of hands during an investigation or a trainee may be a liability—another officer for whom the field training officer is responsible. The enhanced dashcam video demonstrates that in the seconds before Officer Parker took Mr. Patel to the ground, Officer Slaughter stepped away from Mr. Patel and folded his hands. Captain Sanders, the Government's expert from Louisiana, testified that in doing so, Officer Slaughter assumed a "Combat L" position, demonstrating his ability to protect himself. No Alabama officer who testified, including Officer McCullars who trains Alabama officers in use-of-force techniques, was familiar with the "Combat L" position. Officer Parker testified that he could not orally tell Officer Slaughter to come help him take Mr. Patel to the ground because the warning to Mr. Patel could have made the situation more dangerous.

The Government's case suffered not only from substantial direct contradiction from its own witnesses and from evidence put on by the defense, but

also from telling gaps in the record.  For all of the Government's diligent efforts to enhance the dashcam video, the enhanced video fails to capture critical pieces of evidence.  The video does not show whether Mr. Patel placed his hands in his pockets as he walked away from Officers Parker and Slaughter.  As Captain Sanders testified, in the moments before Officer Parker restrained Mr. Patel in preparation for frisking him, it is impossible to see Mr. Patel's hands.  It is also impossible to see Mr. Patel's hands while Officer Parker attempted to frisk him and warned him to stop pulling away.  It is possible to see that Mr. Patel's left foot moved back and his head turned to the left just before Officer Parker took Mr. Patel to the ground, but the video does not reveal whether Mr. Patel was trying to jerk his arms free from Officer Parker's grasp.  The Government decided not to call Officer Slaughter as a witness because of credibility concerns, so Officer Slaughter was not available to fill some of these significant gaps.

The gaps in the evidence and the conflicting nature of the trial testimony proved insurmountable to the Government's ability to obtain 12 guilty votes in two trials, and there is no reason to believe on the record in this case that the Government would fare better in a third or fourth trial.  Officer Parker, like every defendant in a criminal prosecution, is presumed innocent of the charge against him.  To overcome that presumption, the Government would have to prove beyond a reasonable doubt that a reasonable officer, experiencing everything that Officer

Parker experienced and knowing everything that Officer Parker knew about MPD policy and the totality of the circumstances that he confronted on February 6, 2015 on Hardiman Place Lane, would have concluded that it would not have been reasonable to take Mr. Patel to the ground to control him.  In attempting to satisfy that burden, the Government had to work with a record in which witnesses for both the prosecution and defense testified that Officer Parker was justified, even obligated under MPD policy, to stop Mr. Patel and conduct a preliminary investigation; justified in restraining Mr. Patel after Mr. Patel repeatedly walked away from the investigation; and justified in attempting to pat down Mr. Patel to ensure that Mr. Patel was not armed.  Mr. Patel's resistance during the pat down, at least with respect to the resistance captured in the Government's enhanced video clips, is undisputed.  Where the evidence is disputed, the dispute is not subtle, and only Mr. Patel and Officer Parker, both interested parties, have come forward to speak about crucial facts about which there is no objective evidence on which jurors may rely.

The standard for considering a motion for entry of a judgment of acquittal requires the Court to draw all reasonable inferences in favor of the Government. When evidence is subject to multiple interpretations, some of which favor the Government and some of which favor the defense, the Court has construed the evidence in the light most favorable to the Government.  However, when evidence

is unfavorable to the Government, but is not ambiguous, the Court is not required to ignore it. When critical gaps appear in the Government's case, the Court is not required to turn a blind eye to them. On the contrary, the law requires the Court to consider the objective reasonableness of Officer Parker's use of force within the totality of the circumstances. The Court has viewed the full expanse of evidence concerning the use of force and is left with the firm conviction that the evidence concerning use of force in this case is not adequate to support a unanimous verdict of guilt beyond a reasonable doubt. When, as here, "a hypothesis of innocence is sufficiently reasonable and sufficiently strong, then a reasonable trier of fact must necessarily entertain a reasonable doubt about guilt." *United States v. Bell*, 678 F.2d 547, 550 (5th Cir. 1982) (Anderson, J., concurring) *aff'd*, 462 U.S. 356 (1983).[31] Viewing the relevant evidence in the light most favorable to the Government, the Court has determined that that evidence could not be accepted by twelve jurors as adequate and sufficient to support the conclusion of Officer Parker's guilt beyond a reasonable doubt.

---

[31] The original panel decision in *Bell* was issued on March 23, 1981. *United States v. Bell*, 649 F.2d 281 (5th Cir. 1981) *on reh'g*, 678 F.2d 547 (5th Cir. 1982) *aff'd*, 462 U.S. 356 (1983). As the original panel decision would have been binding precedent, the Court considers the en banc rehearing binding as well. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) ("We hold that the decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit."). Again, the Government does not have to rebut all reasonable hypotheses of guilt (*see* p. 3, *supra*), but the Government cannot withstand a motion for judgment of acquittal when the defendant's hypothesis of innocence is firmly grounded in the evidence, much of which came from the Government's witnesses.

## II. Willfulness

"'Willful' . . . is a word of many meanings, and its construction [is] often . . . influenced by its context." *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994) (internal quotation marks omitted) (quoting *Spies v. United States*, 317 U.S. 492, 497 (1943)). "A person acts 'willfully' for purposes of section 242 when he acts with 'a specific intent to deprive a person of a federal right made definite by decision or other rule of law,' or 'in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite.'" *United States v. House*, 684 F.3d 1173, 1199-1200 (11th Cir. 2012) (quoting *Screws v. United States*, 325 U.S. 91, 103, 105 (1945)). The Court first considers the constitutional requirement on which the charge against Officer Parker rests and then examines the evidence of intent in the record.

### A. Specific, Definite Constitutional Right.

For purposes of Section 242, a right is "specific and definite" when "it is defined 'by the express terms of the Constitution' and has been 'made specific' by Supreme Court 'decision[s] interpreting the Constitution,' so that those who violate that right 'are in no position to say that they had no adequate advance notice that they would be visited with punishment.'" *House*, 684 F.3d at 1202 (quoting *Screws*, 325 U.S. at 105). United States citizens' constitutional right to be free from a law enforcement officer's use of unreasonable force is specific and definite.

*See Graham*, 490 U.S. at 394 ("Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a *free citizen*, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees *citizens* the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person.") (emphasis added); *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1326 (11th Cir. 2015) ("A *citizen's* Fourth Amendment right to be free from unreasonable searches and seizures includes 'the right to be free from the use of excessive force in the course of an arrest.'") (quoting *Saunders v. Duke*, 766 F.3d 1262, 1267 (11th Cir. 2014) (emphasis added)).  In both of the trials of this case, the parties assumed that the rights that the Fourth Amendment confers upon citizens extend to Mr. Patel, a non-citizen, and that the right has been made definite by decision or other rule of law.  The Court did not challenge these assumptions during trial; however, in preparing this opinion, the Court looked for binding authority that provides this constitutional protection to non-citizens who are legal residents of the United States.  The Court found no binding authority that specifically and definitely establishes for non-citizens the constitutional right to be free from a police officer's use of excessive force during an investigatory stop or an arrest.

This much is clear:  non-citizens residing in the United States have a host of constitutional rights that have been made definite and specific in a variety of

decisions.   For example, aliens are entitled to the constitutional protections conferred by the First, Fifth, and Fourteenth Amendments.  *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States.  The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law. . . .  Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.") (internal                                                                                                citations omitted);https://a.next.westlaw.com/Link/Document/FullText?findType=Y&serNum=1953118308&pubNum=0000708&originatingDoc=I5dfe49779c9011d9bc61beebb95be672&refType=RP&fi=co_pp_sp_708_477&originationContext=document&transitionType=DocumentItem&contextData=(sc.UserEnteredCitation) - co_pp_sp_708_477 *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596 (1953) (resident alien is a "person" under the Fifth Amendment); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (resident aliens have First Amendment rights).  In *Kwong Hai Chew*, the Supreme Court held that the "Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores.  But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders." *Kwong Hai Chew*, 344 U.S. at 596, n. 5 (quoting *Bridges,* 326 U.S. at 161 (concurring opinion)).  The constitutional rights of non-citizens, though, are not

coextensive with the constitutional rights of United States citizens in every instance. For example, aliens do not have a recognized constitutional right to vote or to hold elected office. *See, e.g., Sugarman v. Dougall*, 413 U.S. 634, 648-49 (1973) ("This Court has never held that aliens have a constitutional right to vote or to hold high public office under the Equal Protection Clause. Indeed, implicit in many of this Court's voting rights decisions is the notion that citizenship is a permissible criterion for limiting such rights.").

In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), Chief Justice Rehnquist explained that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Verdugo-Urquidez*, 494 U.S. at 271.[32] Chief

---

[32] In *Verdugo-Urquidez*, the United States Supreme Court considered whether the Fourth Amendment right to be free from unreasonable searches extended to the search of an alien's residence in Mexico while the alien was detained in the United States. Five Justices answered that question in the negative, and the Court held that the Fourth Amendment does not apply "to the search and seizure by United States agents of property that is owned by a nonresident alien and located in a foreign country." *Verdugo-Urquidez*, 494 U.S. at 261. Nevertheless, there is some debate about whether *Verdugo-Urquidez* is a majority or plurality opinion. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . ..' *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)." *Marks v. United States*, 430 U.S. 188, 193 (1977).

As explained in greater detail below, *see* p. 58, *infra*, Justice Kennedy authored a separate concurring opinion that begins, "Although some explanation of my views is appropriate . . . I do not believe they depart in fundamental respects from the opinion of the Court, which I join." *Verdugo-Urquidez*, 494 U.S. at 278 (Kennedy, J., concurring). Although Justice Kennedy provided the fifth vote, courts have struggled to interpret Justice Kennedy's concurrence, which diverges from the Court's rationale on several significant points. For example, at least three circuit courts of appeal and one district court have referred to *Verdugo-Urquidez* as a plurality

Justice Rehnquist did not define the phrase "substantial connections," but his opinion suggests that an alien's voluntary presence in the United States and acceptance of some societal obligations are factors that help establish substantial connections. *Verdugo-Urquidez*, 494 U.S. at 273. For example, the Chief Justice explained that an individual's "lawful but involuntary" presence in the United States "is not of the sort to indicate any substantial connection with our country." Chief Justice Rehnquist added, "[t]he extent to which respondent might claim the protection of the Fourth Amendment if the duration of his stay in the United States were to be prolonged—by a prison sentence, for example—we need not decide. When the search of his house in Mexico took place, he had been present in the United States for only a matter of days." *Id.* at 271-72.

Noting that the Fourth Amendment's reference to "people" is distinct from the Fifth Amendment's reference to "person," Chief Justice Rehnquist reasoned that "the people" who the Fourth Amendment protects are "a class of persons who are part of a national community or who have otherwise developed sufficient

---

opinion. *Sissoko v. Rocha*, 440 F.3d 1145, 1167 n. 33 (9th Cir. 2006) (referencing "the plurality opinion in *United States v. Verdugo-Urquidez*"), *superseded by* 509 F.3d 947 (9th Cir. 2007); *United States v. Boynes*, 149 F.3d 208, 211 n. 3 (3d Cir. 1998) (noting that "two of the six justices in the *Verdugo-Urquidez* majority coalition did not join the other four justices' reasoning completely"); *Lamont v. Woods*, 948 F.2d 825, 835 (2d Cir. 1991) (explaining that "[t]o a plurality of the Court, the use of the phrase 'the people' suggested that the Framers of the Constitution intended the [Fourth] amendment to apply only to those persons who were part of or substantially connected to the national community."); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 25 (D.D.C. 2012) (referring to *Verdugo-Urquidez* as a "plurality opinion suggesting that certain rights under the First and Fourth Amendments inure to the benefit of only those with sufficient connections to the United States").

connection with this country to be considered part of that community." 494 U.S. at 265. Chief Justice Rehnquist concluded that because Mr. Verdugo-Urquidez had "no voluntary attachment to the United States, and the place searched was located in Mexico," Mr. Verdugo-Urquidez had no Fourth Amendment right to be free from an unreasonable search. *Id.* at 274-75.

The principle espoused by Chief Justice Rehnquist that a non-citizen's constitutional rights are tethered to some extent to the individual's voluntary commitment to this country echoes a statement that the Supreme Court made forty years earlier in *Johnson v. Eisentrager*, 339 U.S. 763 (1950). There, the Court opined:

> The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.

339 U.S. at 770.

Justice Kennedy viewed the Fourth Amendment analysis differently. Justice Kennedy agreed that "the Constitution does not require United States agents to obtain a warrant when searching the foreign home of a nonresident alien," *Verdugo-Urquidez*, 494 U.S. at at 278 (Kennedy, J., concurring), but he placed no weight on Chief Justice Rehnquist's distinction between "people" and "person."

58

Justice Kennedy wrote that he had "little doubt" that if the search "had occurred in a residence within the United States," then "the full protections of the Fourth Amendment would apply." *Id.* at 276, 278 (Kennedy, J., concurring). Justice Stevens asserted in his concurring opinion that "aliens who are lawfully present in the United States are among 'the people' who are entitled to the protection of the Bill of Rights, including the Fourth Amendment," and that the search conducted by the agents was not "unreasonable" under the Fourth Amendment. *Id.* at 279 (Stevens, J., concurring).

Before it issued the *Verdugo-Urquidez* opinion, the Supreme Court seemed to assume, without expressly deciding, that aliens legally residing in the United States, like citizens, have a Fourth Amendment right to be free from unreasonable searches because the Supreme Court held that the Government could not use evidence in a criminal proceeding against a documented alien if the evidence was the product of a search that violated the Fourth Amendment. *See Almeida-Sanchez v. United States*, 413 U.S. 266 (1973) (reversing drug conviction of a Mexican citizen with a United States work visa because of Fourth Amendment violation). The Eleventh Circuit has not expressly held that a legal resident alien is entitled to the full protection of the Fourth Amendment, but the Eleventh Circuit has applied the substantial connection test to determine whether a non-resident alien is entitled to the protections of the Fourth Amendment. *See United States v. Emmanuel*, 565

59

F.3d 1324, 1331 (11th Cir. 2009) (citing *Verdugo-Urquidez* and finding that a Bahamian national whose phone was wiretapped in the Bahamas by foreign authorities had no Fourth Amendment protection because he "was a citizen and resident of the Bahamas with no significant voluntary attachment to the United States").

None of these decisions definitively and specifically addresses the extent of a non-citizen's right under the Fourth Amendment to be free from a police officer's use of excessive force.  This Court has located no such express holding from the United States Supreme Court.  Based on the principles established in the authority discussed above, this Court holds that non-citizens like Mr. Patel secure the Fourth Amendment right to be free from a law enforcement officer's use of excessive force upon entry into the United States because "[m]ere lawful presence in the country creates an implied assurance of safe conduct."  *Eisenstrager*, 339 U.S. at 770.  Moreover, the Fourth Amendment right to be free from excessive force is akin to the Fifth and Fourteenth Amendment rights to due process and equal protection that the United States Supreme Court has extended to non-citizens.  Like due process, the right of an individual to be free from excessive force is part of the "general requirement" that States, in the conduct of their business, "respect certain decencies of civilized conduct."  *Rochin v. California*, 342 U.S. 165, 173 (1952).  Requiring anything less would be "to afford brutality the cloak of law. Nothing

would be more calculated to discredit law and thereby to brutalize the temper of a society." *Id.* at 173-74.

Nevertheless, absent prior binding authority from the Supreme Court or the Eleventh Circuit addressing the issue, the Court cannot find that the Fourth Amendment right of non-citizens to be free from excessive force previously has been made "specific and definite" in the Eleventh Circuit for purposes of Section 242. Ultimately, though, the Court does not rest its decision on this question of law but resolves Officer Parker's renewed motion for judgment of acquittal on the basis of the evidentiary record.[33]

## B. Intent

---

[33] If that were not so, the Court would give the parties an opportunity to present briefs to address the "definite, specific" issue. Because the Court resolves the motion for judgment of acquittal on the basis of the evidentiary record, the Court will not ask the parties to undertake the expense of researching the issue. The Court notes that while it has located no binding authority in the Eleventh Circuit, the Fifth Circuit recently observed that "[a]s a general matter, [the Fourth Amendment] applies to aliens within U.S. territory." *Castro v. Cabrera*, 742 F.3d 595, 599 (5th Cir. 2014) (holding that the false imprisonment and excessive force claims of aliens attempting to enter the United States were subject to dismissal under the entry fiction applicable to immigration detentions because no gross physical abuse was alleged). In addition, the Eighth Circuit has assumed without deciding that the Fourth Amendment protects illegal aliens within the United States. *Martinez Carcamo v. Holder*, 713 F.3d 916, 922 n. 3 (8th Cir. 2013) (holding that, even if an illegal search and seizure had occurred, the constitutional violation was not sufficiently egregious to warrant exclusion of the improperly obtained evidence). By its plain language, 18 U.S.C. § 242 applies to aliens, at least with respect to the "different punishments, pains, or penalties" portion of the statute. Officer Parker has not challenged the statutory boundaries of criminal liability under § 242 as it pertains to aliens, so the Court will not study the issue here.

### 1.  Legal Standard

To obtain a conviction under § 242, the Government had to prove beyond a reasonable doubt that Officer Parker acted willfully, that is, "in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite." *Screws*, 325 U.S. at 105.  In other words, the Government had to prove beyond a reasonable doubt not only that Officer Parker violated Mr. Patel's constitutional rights by taking him to the ground during the investigatory stop, but that Officer Parker had a "bad purpose" in doing so.  *Id.* at 107.  To prove that Officer Parker had the specific intent to deprive Mr. Patel of a constitutional right, the Government did not have to show that Officer Parker was "thinking in constitutional terms . . . ."  *Id.* at 106.  If Officer Parker's "aim was not to enforce local law but to deprive" Mr. Patel of a right "protected by the Constitution," then Officer Parker "at least act[ed] in reckless disregard of constitutional prohibitions or guarantees."  *Id.*  "In sum, to convict a defendant under § 242, the government must show that the defendant had the particular purpose of violating a protected right made definite by rule of law or recklessly disregarded the risk that he would violate such a right. The government does not need to show that the defendant knowingly violated any right."  *United States v. Johnstone*, 107 F.3d 200, 210 (3d

Cir. 1997).[34]

To meet its burden, the Government could offer relevant evidence pertaining

to "all [of] the attendant circumstances" surrounding Officer Parker's encounter

with Mr. Patel—the alleged malice of Officer Parker, the technique used in the

---

[34] The *Johnstone* opinion contains a discussion of the seemingly contradictory explanations of the intent standard in the *Screws* opinion. The *Johnstone* court wrote:

> It is not enough, the Court noted, for the defendant to exhibit "a bad purpose or evil intent." *Id.* at 103, 65 S.Ct. at 1036; *see also id.* at 107, 65 S.Ct. at 1038. Instead, the Court declared that willfulness requires "a specific intent to deprive a person of a federal right made definite by decision or other rule of law...." *Id.* at 103, 65 S.Ct. at 1036; *see also id.* at 104, 65 S.Ct. at 1036–37. *Screws* also requires the violation of a particular right. Clearly, the government has alleged such a violation in this case. As we discussed more fully *supra*, that right is the right to be free from the use of excessive force.
>
> It is not necessary, however, for the government to prove that the defendant was "thinking in constitutional terms [provided that the defendant's] aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution." *Id.* at 106, 65 S.Ct. at 1037–38. The Court reconciles these facially inconsistent standards—that an individual can intend to violate a right even if the individual is not thinking in terms of any right—by recognizing that willfulness includes reckless disregard. *See id.* at 105, 65 S.Ct. at 1037 ("When they act willfully in the sense in which we use the word, they act in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite."); *see also United States v. Messerlian,* 832 F.2d 778, 791 (3d Cir.1987); *United States v. Dise,* 763 F.2d 586, 592 (3d Cir.1985). Finally, *Screws* held that willfulness can be shown by circumstantial evidence. *See Screws,* 325 U.S. at 107, 65 S.Ct. at 1038; *see also Dise,* 763 F.2d at 592.
>
> As is evident from the text, and has oft been noted, *Screws* is not a model of clarity. Some of the sentences therein, examined in isolation, resist easy explanation and can be reconciled only by way of tortuous logic. Our task, however, is to read these sentences in light of the text of *Screws* in its entirety. The plurality in *Screws* believed its pronouncements to be consistent; we must do the same."

*Johnstone*, 107 F.3d at 207-08. This Court shares the views of the *Johnstone* court.

takedown, the character and duration of the police encounter with Mr. Patel, "the provocation, if any, and the like." *Screws*, 325 U.S. at 107.  The Eleventh Circuit has explained that for purposes of evaluating intent, "a series of individual actions that 'support an innocent explanation,' when 'viewed in a vacuum,' may in combination provide sufficient evidence for a reasonable juror to infer a defendant's intent." *House*, 684 F.3d at 1200 (quoting *United States v. Harris*, 20 F.3d 445, 453 (11th Cir. 1994)).  In addition, "the defendant's 'subsequent conduct may be considered if it supports a reasonable inference as to [his] prior intent.'" *Id.* at 1200 (alteration in original) (quoting *United States v. McCarrick*, 294 F.3d 1286, 1291 (11th Cir. 2002)).

Consistent with these principles, the Court gave the jurors the following instructions concerning willfulness:

> To act willfully means to act voluntarily and purposefully with the specific intent to do something the law forbids.
>
> In this case, to act willfully means to act with the specific intent to interfere with Mr. Patel's constitutional right to be free from the unreasonable use of physical force by law enforcement officers.
>
> . . .
>
> Reckless disregard of a person's established constitutional rights is evidence of specific intent to deprive that person of those rights.
>
> . . .
>
> Intent can be proved by circumstantial evidence.  It is often difficult to prove a person's intent directly because there is no way of directly

scrutinizing the inner workings of another's mind.  Thus, in determining what a person intended, you may consider any statements the person made and any acts he did or did not do, as well as all other facts and circumstances received in evidence that may aid in your determination of that person's knowledge or intent.

In determining a person's intent, you may infer that a person ordinarily intends all the natural and probable consequences of an act he or she knowingly takes.  In other words, you may infer and find that Mr. Parker intended the consequences that a police officer standing in like circumstances and possessing like knowledge should have expected to result from actions he took knowingly.

(Doc. 107, p. 144-45; Doc. 69, pp. 152-54).

A number of decisions illustrate the quality and quantum of evidence of "bad purpose" necessary to obtain a conviction under § 242.  In *Screws*, a sheriff and two other law enforcement officers arrested "Robert Hall, a citizen of the United States and of Georgia."  Mr. Hall was African-American.  "The arrest was made late at night at Hall's home on a warrant charging Hall with theft of a tire." 345 U.S. at 92.  For this alleged crime, for which the law presumed Mr. Hall not guilty, the officers handcuffed Mr. Hall and took him by car to the court house. When Mr. Hall stepped out of the police car, while he was still bound in handcuffs,

the three petitioners began beating him with their fists and with a solid-bar blackjack about eight inches long and weighing two pounds. They claimed Hall had reached for a gun and had used insulting language as he alighted from the car. But after Hall, still handcuffed, had been knocked to the ground they continued to beat him from fifteen to thirty minutes until he was unconscious. Hall was then dragged feet first through the court house yard into the jail and thrown upon the floor dying. An ambulance was called and Hall was removed to a hospital where he died within the hour and without regaining

> consciousness. There was evidence that [Sheriff] Screws held a grudge against Hall and had threatened to "get" him.

325 U.S. at 92-93.  Because of an error in the jury charge during the first trial of the *Screws* case, the Supreme Court reversed the judgment of the Circuit Court of Appeals, which had affirmed the defendants' convictions.   In doing so, the Supreme Court characterized the defendants' conduct as "shocking and revolting," and rightfully so.  *Id.* at 92.  The Supreme Court held that the jury charge was in error because it did not require a finding of "bad purpose", and § 52—now § 242— "was not intended to make a federal crime of every local act of police brutality." *United States v. Ragsdale*, 438 F.2d 21, 26 (5th Cir. 1971) (discussing the *Screws* decision).  The Supreme Court held that "the jury should have been []instructed that it was not sufficient that petitioners had a generally bad purpose.  To convict it was necessary for them to find that petitioners had the purpose to deprive the prisoner of a constitutional right, e.g. the right to be tried by a court rather than by ordeal." *Screws*, 325 U.S. at 107.  "And in determining whether that requisite bad purpose was present the jury would be entitled to consider all the attendant circumstance[s]—the malice of petitioners, the weapons used in the assault, its character and duration, the provocation, if any, and the like."  *Id.*; *see also Ragsdale*, 438 F.2d at 26.

In *Ragsdale*, a sheriff gave a prisoner who walked away from the prison a choice of consequences:  either the sheriff would "swear out a warrant against [the

prisoner] for the offense of escape from custody or would administer summary punishment in the form of six strokes of the restraining belt." 438 F.2d at 22. The prisoner chose the latter consequence, and the sheriff dispensed the punishment. In applying *Screws* and affirming the judgment of conviction under § 242, the Court of Appeals held: "the uncontradicted proof showed that the reason Sheriff Ragsdale beat prisoner Williams was his deliberate decision that, if Williams chose to forego his constitutional right of a trial by law for the crime of escape, he, Ragsdale, would take the law into his own hands and act summarily as prosecutor, judge, jury and punisher for such crime." *Id.* at 26. The Court explained: "The statement of the Sheriff that he considered his actions a form of prisoner discipline and thus that his thoughts were free of malice was a part of the evidence which the jury heard. The instructions of the judge left them the option to believe or disbelieve what they had heard. However [the judge] correctly instructed [the jurors] that if they accepted as true the evidence which established that the Sheriff strapped Williams for the crime of escape and did so as an alternative to instituting a proceeding against his prisoner for that crime according to the forms of the law, then they could infer the intent necessary to constitute a violation of § 242." *Id.* The Court of Appeals observed: "Noble motives and pure thoughts cannot bar the conviction of one who admits intentional action which violates the proscriptions of a statute declaring that action criminal, and a judge can properly instruct as to what

acts the statute condemns . . . ."  *Id.*

In *House,* the defendant "worked for the Federal Protective Service as a law enforcement officer and inspector. The Federal Protective Service is a law enforcement agency with jurisdiction over properties owned and operated by the General Services Administration."   684 F.3d at 1184.   The defendant wore a uniform identifying him as a law enforcement officer, wore a utility belt in which he carried a handgun, a radio, and handcuffs, and operated a marked vehicle equipped with sirens and emergency lights.   The defendant made a practice of stopping motorists.   That practice violated agency policy which, with limited exceptions, "prohibited officers from conducting traffic stops for minor traffic violations outside of federal property in the State of Georgia."   *Id.* at 1185. Following the unlawful stops, the defendant would submit to his department incident reports that contained "materially false statements" regarding the stops. *Id.*

The Eleventh Circuit held that the record contained sufficient evidence of willfulness to support the defendant's conviction under § 242.   The Eleventh Circuit described the relevant evidence of willfulness as follows:

> The testimony of [some of the individuals who the defendant pulled over] established a pattern of conduct by House in which he repeatedly seized motorists without regard for the requirements of the Fourth Amendment and then attempted to conceal his actions by making false statements in his incident reports.  [Other motorists'] testimony suggests that House's behavior during their encounters with

him fit into this same pattern. The sheer number of unreasonable seizures that House effected, as well as his efforts to prevent his superiors' detection of his actions, entitled the jury to infer that House acted willfully when he effected the seizures charged in counts four, seven, nine, and eleven.

684 F.3d at 1202.

In *Johnstone*, the Third Circuit affirmed the conviction of Ronald Johnstone, a former officer in the Kearney, New Jersey Police Department under § 242 for use of excessive force.  *Johnstone*, 107 F.3d at 202.  Johnstone, who was "six-foot three inches and three hundred pounds," was found guilty on a series of counts, including: throwing a suspect against the hood of a patrol car, punching the suspect, and thrusting the suspect's head against the roof of the car while placing him inside; kicking a suspect in the mouth and chest after the suspect had been handcuffed and forced to lie on the ground; striking a suspect in the head and chest with a flashlight to force him to reveal the name of an accomplice; striking a suspect in the back of the head while handcuffing him and later "punching and kicking him in the head and on the body;" and pulling a suspect off a bar stool, throwing him against a video machine and a wall, pushing him to the ground, kicking him, and then placing him in handcuffs.  *Id.* at 203.  As in *House*, the defendant's conduct in *Johnstone* demonstrated a pattern of willful behavior that satisfied the intent requirement of § 242.

Finally, in *United States v. Reese*, the members of a drug task force within

the Oakland Housing Authority Police Department were convicted "for conspiring to 'injure' another 'in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States,' 18 U.S.C. § 241," and under § 242. *United States v. Reese*, 2 F.3d 870, 880 (9th Cir. 1993). The government produced evidence at trial that the task force members had regularly used force against unresisting individuals found in and around Oakland Housing Authority properties. *Id.* at 874-80. The task force's uses of force included beating handcuffed suspects, throwing a suspect to the ground repeatedly and with sufficient force to fracture his elbow, kicking a sleeping and handcuffed arrestee in the chest, splitting open the scalp of a suspect with a flashlight in retaliation for an injury to a task force member, performing an unnecessary body cavity search on a suspect in view of the street, tying the drawstring of a hooded jacket so tightly around a suspect's throat that the suspect began to choke and the drawstring had to be cut free, and punching the same suspect in the jaw until the suspect began to experience a seizure. *Id.*

With this precedent in mind, the Court evaluates the evidence of willfulness in this case.

### 2. Evidence

To evaluate the willfulness element of the charge against Officer Parker, the jurors could consider all of the evidence described in the discussion of the events

that led Officer Parker to take Mr. Patel to the ground and the manner in which Officer Parker took Mr. Patel to the ground.  *See* pp. 6-36, *supra*.  The jurors also could consider Officer Parker's testimony that he did not intend to hurt Mr. Patel in the takedown.  (Doc. 107, p. 130).  Finally, jurors could consider Officer Parker's conduct in the hours following his encounter with Mr. Patel.

Once Mr. Patel was on the ground, Officer Parker repeated, "Stop trying to jerk away from me."  (GX1, 1:57–2:00; GX2, p. 3).  Officer Parker fell to the ground with Mr. Patel but recovered quickly.  While on one knee next to Mr. Patel, Officer Parker called for a supervisor per MPD's use-of-force policy.  (GX1, 2:04–2:06; GX2, p. 4; GX4, line 12; Doc. 105, pp. 104-04; Doc. 107, p. 79; GX26, p. 2).  Captain Stringer confirmed that an officer must notify a superior as soon as it is safe to do so, and he testified that Officer Parker was trying to follow MPD policy when he called his superior.  (Doc. 106, pp. 24, 33).

Officer Parker then placed handcuffs on Mr. Patel.  (GX1, 2:11–2:39).  Officer Parker testified that he applied the handcuffs to gain control of Mr. Patel's hands.  (Doc. 107, pp. 68, 79).  Officer Parker remarked to Officer Spence:  "He keeps on jerking away from me."  (GX1, 2:13–2:15; Tr. p. 4).

Mr. Patel stayed on the ground.  His nose was bleeding, and he did not respond when Officer Parker asked if he had anything in his pockets.  (GX1, 2:44–2:46; GX2, p. 4; GX4; Doc. 105, pp. 58, 87; Doc. 65, pp. 38, 87, 89-91).

Consistent with MPD's use-of-force policy, Officer Parker called for medics. MPD's policy states: "Officers who deploy any type of force that results in injury to anyone will make all reasonable efforts to provide first aide in a timely manner, **when safe to do so**." (GX26, p. 2) (emphasis in written policy).

In his call for medics, Officer Parker stated that he needed help "for a subject with a bloody nose." (GX2, p. 5; GX3). Officer Parker described Mr. Patel to dispatch as an "[o]lder Indian male, doesn't speak English." (GX1, 3:33–3:36; GX2, p. 5; GX4, lines 16, 18; Doc. 107, pp. 88-89). The enhanced dashcam video indicates that none of the officers at the scene understood the extent of Mr. Patel's injuries in the moments following the takedown. Officer Spence directed the subject: "[u]ncross your legs. Uncross your legs. All right. Stand up. Let's go." (GX1, 3:52–3:53; GX2, p. 5). Officer Parker also instructed Mr. Patel to stand. Then Officer Spence asked: "Can you stand up?" (GX2, p. 5). Officer Parker stated: "He can't speak any English." (GX1, 4:04–4:06; GX2, p. 5). Officer Parker asked Mr. Patel if he was okay. (GX1, 4:38–4:39; GX2, p. 6). Officer Spence asked Mr. Patel again if he could stand and if he could understand English. (GX1, 4:56–5:05; GX2, p. 6).

While Officers Spence and Slaughter continued to try to get Mr. Patel to his feet, Officer Parker walked to his patrol car to call his supervisor, Lieutenant

Harrell.  (Doc. 105, p. 86; Doc. 65, p. 84).  Officer Parker reported to Lieutenant

Harrell:

> We got out here, an Indian male, uh, an older guy, and tried to get him
> to stop.  He kept walking on.  We couldn't get him to stop.  He'd keep
> walking.  Told him to stop, went to pat him down and he kinda jerked,
> so I put him on the ground.  And, I don't know what he's got in his
> pockets.  I put him on the ground and…  He can't speak a bit of
> English.  I really don't know why he's in the neighborhood, if he lives
> here or what.  Uh.  Well, I didn't know what else to do because I put
> him on the ground.  [Unintelligible]  He kept going away.  We
> couldn't find out anything.  [Unintelligible]

(GX1, 5:42–6:23; GX2, pp. 6-7).  This oral report providing details of the events

leading to the takedown was consistent with MPD's Response to Resistance

policy, which states that officers who use force must "be able to articulate that their

decisions and actions were reasonable at the time of a response to resistance

incident based on the totality of the circumstances and information available to

them at the time."  (GX26, p. 2).  Lieutenant Harrell told Officer Parker that he

would discuss matters with him when he arrived at the scene.  (Doc. 105, p. 86).

Officer Parker returned to where Officers Spence and Slaughter were

waiting with Mr. Patel for medics to arrive.  Officer Parker asked Mr. Patel where

he lived.  Mr. Patel replied, "No English."  Officer Parker then asked, "Why are

you in this neighborhood?"  Mr. Patel answered, "No English."  Officer Parker

responded, "You just talked to me in English, and you're telling me 'No English.'

You can understand English." Mr. Patel stated, "India." (GX1, 6:40–7:04; GX2, p. 7).

Officer Spence asked if he should try "to get one of them Indians from Chevron over here." (GX2, p. 8). Officer Parker replied that it was better to wait to see what Lieutenant Harrell wanted to do. Officer Parker told Officer Spence: "I'm going to take his handcuffs off him where he can sit here. I just didn't know why he kept reaching in his pocket. That's why I wanted to detain him." (GX1, 7:23–7:29; GX2, p. 8). Officers Slaughter, Spence, and Parker urged Mr. Patel to stand and go to the patrol car where it would be warmer. Mr. Patel did not respond. (GX1, 7:50–7:56; GX2, p. 8). Officer Parker remarked, "I didn't want to put him on the ground. [] He just kept jerking away from me, man." (GX1, 7:42–7:45; GX2, p. 8). Officers Spence and Parker continued their efforts to elicit information from Mr. Patel and to get him to stand. (GX1, 8:00–9:28; GX2, pp. 8–9). Officer Slaughter asked, "Still got fire coming?" Officer Parker replied, "I hope so." (GX1, 9:36–9:39; GX2, p. 9). Officer Spence asked Mr. Patel for his address and asked if he could point to where he lived. Mr. Patel did not respond. Officer Slaughter remarked, "[t]here's something wrong with him." (GX1, 9:54–10:03; GX2, pp. 9-10).

The Madison Fire Department arrived on the scene before the medics arrived. (GX1, 10:18–11:06). Officer Slaughter stated, "[w]e had to put him on

the ground." (GX1, 11:09–11:10; GX2, p. 10).  Officer Spence explained that Mr. Patel was "kind of out of it." (GX1, 11:10–11:11; GX2, p. 10).  Officer Slaughter added, "[w]e tried to pick him up.  And he's just going completely limp." (GX1, 11:18–11:20; GX2, p. 10).  Officer Spence remarked, "[h]e says he don't speak English . . . All right?  But then he spoke English to tell us he doesn't speak English." (GX1, 11:20–11:26; GX2, pp. 10-11).

Officer Parker told the fire medics twice that he took Mr. Patel to the ground.  When one medic asked if the officers found the subject lying on the ground, Officer Parker responded, "No.  I put him on the ground." (GX1, 12:48–12:55; GX2, p. 13).  Officer Parker commented:  "He kept trying to jerk away from me." (GX1, 12:57–12:58; GX2, p. 13).  Officer Parker continued, "[t]he last thing I'd ever want to do is to try to – " (GX1, 13:13–13:15; GX2, p. 14).  When the medic asked Officer Parker how he was doing, Officer Parker responded, "I tried to pat him down.  He kept trying to walk away [sic] me.  When I did, he jerked away from me.  I put him on the ground.  And then he hasn't gotten up since." (GX1, 13:28–13:35; GX2, p. 14).[35]

---

[35] During the first trial in this case, Rachelle Stott, one of the HEMSI paramedics who appeared after the Madison Fire paramedics, testified as a witness for the Government.  Counsel for the Government elicited from Ms. Stott testimony regarding the fact that no one told her that a police officer had taken Mr. Patel to the ground.  Ms. Stott stated that this was important information that should have been provided to her to help her determine how to treat Mr. Patel.  (Doc. 65, pp. 119-20).  Jurors could have inferred from Ms. Stott's testimony that Officers Parker and Slaughter withheld important information from the medics about the cause of Mr. Patel's injury.  That would be an improper inference, given the undisputed evidence that Officers Parker and

When Lieutenant Harrell arrived, Officer Parker told him that Mr. Patel was not under arrest.  (GX1, 11:31–11:34; GX2, p. 11).  Officer Parker stated that he handcuffed Mr. Patel because Mr. Patel kept trying to jerk away, "[s]o my thought was is that he's got something in his pockets."  (GX1, 11:39–11:41; GX2, p. 11). Lieutenant Harrell asked if it could be "something as simple as a language barrier?"  (GX1, 11:41–11:43; GX2, p. 11).  Officer Parker replied, "he was telling me his name and all of that.  And then, all of a sudden, whenever he was telling me like—'No English' is what he keeps saying.  So it could be a language barrier, but I don't think so . . . .  I don't know exactly what he was up to, but when he saw us, he kept trying to go."  (GX1, 11:47–12:03; GX2, pp. 11-12).  Officer Parker continued:

> I saw his nose, it bothered me because I didn't want to—that's the only thing I wanted.  I didn't mean to do—you know, when I put him—he kept jerking away from me.  My thought was "Hey, he's got something on him that he's going to try to get me with."  And now he's acting like he can't—he won't stand up or anything.

(GX1, 12:08–12:23; GX2, p. 12).

Officer Parker acknowledged to Lieutenant Harrell that he (Parker) did not see Mr. Patel go into a yard.  In his conversation with Lieutenant Harrell at

---

Slaughter told the fire medics multiple times that Officer Parker put Mr. Patel on the ground. (GX1, 11:09–11:10, 12:53–12:55, 13:31–13:33; GX2, pp. 10, 13, 14).  The statements from Officer Parker and Officer Slaughter are clear in the Government's transcript of the enhanced dashcam video, but the statements are not as easy to discern in the video, and jurors would not have the transcript during their deliberations because the transcript is an aid for jurors during trial; it is not evidence.  To avoid this confusion, the Government did not try to develop similar testimony through Ms. Stott during the second trial.

Hardiman Place, Officer Parker stated that he put Mr. Patel on the ground because when he told Mr. Patel that he was going to pat him down, Mr. Patel jerked away, and Officer Parker thought Mr. Patel "might have something on him" because Mr. Patel "kept going struggling and trying to get away again. That's why I put him on the ground." (GX1, 14:50–14:59; GX2, pp. 15-16). Moments later, Officer Parker repeated, "the last thing I ever wanted to do is try to hurt him in any way. I just— he kept jerking away from me. And it made me feel that he was trying to go into his pockets and stuff . . . . All the time, I thought he was going in his pockets. He kept jerking away." (GX1, 16:10–16:18, 17:48–17:51; GX2, pp.16–17). At trial, Officer Parker testified that one way an officer can take control of an individual is to take the person's hands out of his pockets for him. Officer Parker explained that if an individual had his hands in his pockets, and an officer decided that a pat down was necessary, the officer could remove the hands and put them behind the suspect's back. (Doc. 107, pp. 42-43; Doc. 69, p. 69).

Lieutenant Harrell left Officer Parker and accompanied the medics as they took Mr. Patel to Madison Hospital's emergency room. (Doc. 105, p. 146; Doc. 65, pp. 40, 88, 116). Officer Spence went to the hospital too. (Doc. 105, pp. 87–88; Doc. 65, p. 41). Officers Parker and Slaughter left Hardiman Place and returned to the precinct to write reports about their encounter with Mr. Patel.

Lieutenant Harrell instructed Officer Parker to prepare an incident report, and he directed Officer Slaughter to prepare a supplemental report. (Doc. 105, p. 90).

When he returned to the precinct, while Officer Parker was working on his report, Lieutenant Harrell watched the dashcam video of the takedown. After he reviewed the video, Lieutenant Harrell questioned Officer Parker about the technique that he used in the takedown. Lieutenant Harrell asked Officer Parker if he used a leg sweep. Officer Parker replied that he did not recall using a leg sweep. (Doc. 105, p. 93). Lieutenant Harrell testified that later, he and Officer Parker watched the dashcam video together, and at some point, Officer Parker acknowledged that he used a leg sweep. (Doc. 105, p. 93). Officer Parker denies that he told Lieutenant Harrell that he used a leg sweep to take Mr. Patel to the ground. (Doc. 107, pp.124-25). In his written report about the incident, Officer Parker did not provide a description of his takedown technique, and he did not write that he lost his balance and fell with Mr. Patel. (Doc. 107, p. 127).

When Lieutenant Harrell reviewed Officer Parker's report, he gave the report back to Officer Parker and told him to add the details. Lieutenant Harrell explained: "I questioned him about the events and he would tell me things about the event that had not been included in the report and I would instruct him to put it in the report." (Doc. 105, p. 91; Doc. 65, pp. 94-95, 99). Although he did not write it in his incident report, Officer Parker told Lieutenant Harrell that he

believed that there had been a number of burglaries in the Hardiman Place area. (Doc. 105, p. 92; Doc. 65, p. 108). At trial, Lieutenant Harrell acknowledged that there had been a number of burglaries in Madison around the time of February 6, 2015, but Lieutenant Harrell did not know the exact number. (Doc. 105, p. 102). After he reviewed Officer Parker's report on February 6, 2015, Lieutenant Harrell told Officer Parker to contact the dispatcher to get information about other burglaries near Hardiman Place so that Officer Parker could document the information. (Doc. 105, p. 92; Doc. 65, p. 105).

To comply with Lieutenant Harrell's instruction, Officer Parker contacted Angela Sharp in the Madison 911 Call Center and asked her to do research to determine how many burglaries occurred near Hardiman Place Lane. (GX3, 0:16–0:34; Doc. 105, pp. 121-126). Ms. Sharp asked Officer Parker if he basically needed her to "stack [his] PC" or probable cause. (GX3, 1:08–1:12; Doc. 105, p. 124). Officer Parker replied, "you're awesome." (GX3, 1:13–1:14 ; Doc. 105, p. 125). Ms. Sharp testified that officers routinely call her to stack their PC. (Doc. 105, p. 135).

Lieutenant Harrell met with Officer Parker and Sergeant Marc Bray on the morning of February 7, 2015. Sergeant Bray currently is assigned to the Office of Professional Standards, commonly called "Internal Affairs." On February 7, 2015, he was a first shift patrol sergeant, and he was superior in rank to Lieutenant

Harrell and Officer Parker.  (Doc. 106, p. 166).  The officers were meeting because Officer Parker asked Lieutenant Harrell to discuss the dashcam video with him. During the meeting, Officer Parker explained to Lieutenant Harrell that he (Officer Parker) was just trying to control Mr. Patel and that he did not mean to hurt Mr. Patel.   (Doc. 105, p. 103; Doc. 107, pp. 68, 130).[36]  Sergeant Bray testified that Lieutenant Harrell told him and Officer Parker that "everything was okay."[37]

Lieutenant Harrell completed a use-of-force report about the incident involving Mr. Patel.  Lieutenant Harrell's superior officer rejected the report because it contained too much detail, and he instructed Lieutenant Harrell to redo the report.  (Doc. 105, p. 106; Doc. 106, p. 172; Doc. 65, p. 104).

### 3.  Analysis

As with the Government's use-of-force evidence, Officer Parker answered each piece of evidence that the Government offered concerning willfulness and established a hypothesis of innocence that is sufficiently reasonable and sufficiently strong that a reasonable trier of fact must necessarily entertain a reasonable doubt about Officer Parker's alleged specific intent to deprive Mr. Patel of his Fourth Amendment rights.

---

[36] Lieutenant Harrell testified that he believed that he asked Officer Parker to review the dashcam video with him.  (Doc. 105, pp. 102-03).  Sergeant Bray stated that Officer Parker requested the meeting.  (Doc. 106, p. 163).

[37] Sergeant Bray testified that Lieutenant Allen told him to keep Officer Parker at the station for the weekend, and Lieutenant Allen also said that everything was okay.  (Doc. 106, p. 165).

The Government attempted to prove intent by circumstantial evidence. The Government's primary source of circumstantial evidence concerning willfulness is the visual record of the force with which Mr. Patel hit the ground face-first and the undisputed evidence that Officer Parker restrained Mr. Patel's hands during the takedown, thereby preventing Mr. Patel from breaking his fall. (Doc. 107, pp. 147-48; Doc. 112, p. 2). The Government argued that Officer Parker either knew or recklessly disregarded the fact that a forceful takedown to the frozen ground without an opportunity to break the impact was almost certain to cause an injury. (Doc. 107, pp. 147-48, 169). The visual evidence was shored up by statements from the Government's expert witness about the violence of the takedown maneuver, Lieutenant Harrell's testimony that he believed that Officer Parker used a leg sweep, and Lieutenant Harrell's testimony that although Officer Parker initially denied using a leg sweep, after watching the dashcam video with Lieutenant Harrell, Officer Parker admitted that he used a leg sweep. (Doc. 107, p. 152; Doc. 112, p. 4). The evidence is clear that the maneuver that Officer Parker used to take Mr. Patel to the ground was not a technique that officers learned at the police academy. (Doc. 112, p. 4).

In answer to this evidence, Officer Parker offered the testimony of Sergeant Bray, who stated that when he reviewed the dashcam video, it appeared to him that Officer Parker lost his balance as he began the takedown. As a result, Officer

Parker was not able to control the takedown, and he and Mr. Patel fell together. That testimony was consistent with Officer Parker's explanation of the takedown and supported by the testimony of Officer Parker's expert. Officer Parker also testified that as he began to execute the takedown, he directed his body toward the grass and away from the concrete sidewalk because he did not want Mr. Patel to hit the hard concrete. The dashcam video confirms that Officer Parker tried to direct Mr. Patel's fall to the grass rather than the sidewalk. Officer Parker denied that he told Lieutenant Harrell that he used a leg sweep, and Sergeant Bray testified that when he, Lieutenant Harrell, and Officer Parker met on February 7, 2015 to discuss the dashcam video, Lieutenant Harrell said that everything was alright.

Counsel for the Government argued that Officer Parker's tone of voice before and after the takedown provided additional circumstantial evidence of intent. Under the Government's depiction of the evidence, Officer Parker was shouting at Mr. Patel because he was frustrated because he believed that Mr. Patel was not showing he and Officer Slaughter respect. (Doc. 107, pp. 168-69). The record demonstrates that when Officer Parker took the lead in the investigation and restrained Mr. Patel's hands so that Officer Slaughter could conduct a pat down, Officer Parker began shouting at Mr. Patel to "stop jerking away," and Officer Parker warned Mr. Patel that he would put him on the ground if Mr. Patel did not stop jerking. Immediately following the takedown, while applying handcuffs,

Officer Parker shouted, "Stop trying to jerk away from me," and he told Officer Spence, "I don't know what his problem is but he won't listen." The Government established that use of force out of anger or frustration would violate the MPD resistance to force policy.

In answer to the Government's argument that the tone and tenor of Officer Parker's voice indicated anger and frustration, Officer Parker relied on testimony from Captain Stringer and Officer McCullars, an instructor at the Alabama police academy that Officer Parker attended, which establishes that officers are trained to give clear, loud commands to subjects to warn subjects of the actions that the officer is prepared to take. Loud warnings of potential consequences are designed to gain a subject's compliance so that an officer does not have to revert to force. Officer Parker's repeated warnings and instructions to Mr. Patel are evidence of Officer Parker's efforts to avoid the use of force. Officer Parker took Mr. Patel to the ground after he gave Mr. Patel three warnings that he was prepared to do just that if Mr. Patel did not stop jerking away; as discussed, Mr. Patel's ability to understand those instructions is disputed. Officer Parker testified that he was not frustrated with Mr. Patel, and he did not believe that Mr. Patel was showing disrespect.

The Government also argued that the denials and rationalizations that Officer Parker made after the takedown reveal a consciousness of guilt, of having

done something the law forbids.  (Doc. 107, pp. 150-51; Doc. 112, p. 4).   The record demonstrates that as Officer Spence approached Officer Parker and Mr. Patel following the takedown, Officer Parker told Office Spence, "He keeps on jerking away from me" and "he keeps trying to walk away from me."   Officer Parker told Lieutenant Harrell and the medics that he did not mean to hurt Mr. Patel.  Officer Parker did not mention anything about Mr. Patel reaching into his pockets until after he realized that Mr. Patel was unable to stand.  (Doc. 112, p. 4).   It was only then that Officer Parker added to the reasons that he gave for the takedown his concern that Mr. Patel might have something in his pockets.  From this evidence, the Government argued that Officer Parker's statements about Mr. Patel placing his hands in his pockets were pretextual and a fabricated justification for the takedown, and Officer Parker's protests that he did not mean to hurt Mr. Patel reflect Officer Parker's consciousness of his wrongdoing.  (Doc. 107, p. 169-70).

An alternative explanation for the timing of Officer Parker's first statement of concern that Mr. Patel might have something in his pockets casts reasonable doubt on the Government's consciousness of guilt argument.  Officer Parker first mentioned his concern when he telephoned Lieutenant Harrell, his superior officer, shortly after the takedown.  Officer Parker spoke about what might be in Mr. Patel's pockets in the context of a long description of the encounter that led to the

takedown.   The detailed oral description that Officer Parker gave Lieutenant Harrell complied with the MPD's Response to Resistance policy which states that officers who use force must "articulate" that their decisions and actions were reasonable based on the totality of the circumstances and information available to them when they employed force.  Indeed, the evidence shows that Officer Parker complied fully with MPD policy following the takedown.  The policy requires an officer to notify a superior as soon as it is safe to do so following a use of force, and Officer Parker called dispatch for a supervisor as soon as he got to his knees following the takedown.  Captain Stringer testified that Officer Parker was trying to follow MPD policy when he called his superior.  The policy also requires an officer who uses any type of force that results in injury to anyone to make all reasonable efforts to provide first aid as soon as possible.  Officer Parker called for medics when he saw that Mr. Patel's nose was bleeding.  He told the first medics who arrived that he had taken Mr. Patel to the ground and that Mr. Patel had not gotten up from the ground since the takedown.

The Government relied on inconsistencies between Officer Parker's statements to other officers and in his call for medics about Mr. Patel's ability to speak English as circumstantial evidence of intent.  (Doc. 107, pp. 150-51; Doc. 112, p. 3).  Officer Parker stated in his call to dispatch following the takedown that Mr. Patel could not speak English.  He made a similar statement to Officer Spence

when Officer Spence arrived and to Lieutenant Harrell when Officer Parker called
Lieutenant Harrell.   Later, when Lieutenant Harrell arrived at the scene, Officer
Parker, in response to a question from Lieutenant Harrell about a language barrier,
stated that Mr. Patel "was telling me his name and all of that.   And then, all of a
sudden, whenever he was telling me like—'No English' is what he keeps saying."
These inconsistencies were damaging to Officer Parker's credibility and certainly
were worthy of jurors' consideration.   Of course, Mr. Patel testified that he did
speak English to Officers Parker and Slaughter, so that evidence must also factor
into the equation.

The Government argues that the evidence that demonstrates that Officer
Parker knew that Mr. Patel could not speak English supports the inference that
Officer Parker also knew that a victim who couldn't speak English could not
comply with his orders.  (Doc. 107, p. 150; Doc. 112, p. 3).  The evidence shows,
though, that Officer Parker consistently took the position that Mr. Patel could
understand English, and as discussed above, there was ample evidence—visual and
testimonial—to support Officer Parker's belief.   If Mr. Patel understood Officer
Parker's commands, then Mr. Patel could have complied with those commands by
standing still.   The takedown was based on what Mr. Patel did—he clearly walked
away from officers, he clearly turned to look at Officer Parker and took a step
while Officer Parker was restraining him for a pat down, and there is strong though

disputed evidence that he jerked his arm as Officer Parker was trying to restrain his hands.

As additional circumstantial evidence of intent, the Government pointed to Officer Parker's incident report.  (Doc. 112, p. 4).  The Government urged the jurors to consider that Officer Parker initially submitted a vague report, and he gathered statistics from dispatch to pad the information concerning probable cause in his report because he knew that he had violated Mr. Patel's constitutional rights, and he was trying to cover up the violation.  (Doc. 107, p. 151; Doc. 112, p. 4). The answer to this argument is two-fold.  First, Lieutenant Harrell told Officer Slaughter to add to his written report details that Officer Parker provided to Lieutenant Harrell orally.  If Officer Parker had been trying to hide details from his superiors, he would not have provided those details to Lieutenant Harrell orally or otherwise.   Second, Lieutenant Harrell instructed Officer Parker to gather information about other burglaries in the Hardiman Place area to add to his report. If Officer Parker were trying to cover up his alleged willful wrongdoing, Officer Parker presumably would have done that research and placed the information in his report *before* he submitted the report to Lieutenant Harrell; he would not have done so in response to an instruction from his superior officer.  Moreover, the dispatch employee who testified about Officer Parker's request for information about other burglaries stated that Madison police officers routinely call her to request

information to prop up their PC (or probable cause).   Lieutenant Harrell acknowledged that when he submitted his written report about the encounter between Officers Parker and Slaughter and Mr. Patel, his (Lieutenant Harrell's) superior officer told him to remove some of the detail from his report.  The Court reserves comment on these reporting procedures for another opinion in this case.

Another MPD procedure factors into the willfulness calculation:  jurors could consider MPD's procedure of assigning officers with limited experience as field training officers.  In this case, this policy made a second-year officer with limited training and experience responsible for the safety of a brand new officer.  It logically follows that a fairly inexperienced officer, who received no training in defensive tactics since attending the police academy and who is charged with responsibility for the safety of a new officer who is not certified to act independently, might react quickly to resistance from a subject to prevent the situation from escalating into one that the young field training officer might not be able to control.   The inference would be buttressed by MPD's "Response to Resistance" policy, which states that officers do not have to hesitate to use reasonable force to respond to resistance.  When judging subjective intent, jurors may consider that a fairly inexperienced officer and a more seasoned officer might

assess the same situation differently, particularly when making split-second decisions in a dynamic situation.[38]

As the Court stated in both of the trials of this case, willfulness generally is a question that a jury must resolve, and jurors generally are tasked with the responsibility for assessing the credibility of witnesses. *United States v. Feliciano*, 761 F.3d 1202, 1206 (11th Cir. 2014) ("[t]he jury has exclusive province over the credibility of witnesses, . . . unless [testimony] is 'incredible as a matter of law.'") (quoting *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999)); *but see* note 30, above. At least some of the jurors who evaluated the evidence of willfulness in both trials in this case repeatedly voted for acquittal because the entirety of the evidence is sufficiently strong and sufficiently reasonable to support Officer Parker's hypothesis of innocence.[39] Officer Parker's version of the evidence is sufficiently strong and reasonable that jurors must entertain a reasonable doubt about guilt.

As a matter of law, the conduct in this case is not remotely similar to the conduct for which judgments of guilt have been affirmed in other cases under § 242. In *House*, for example, the evidence demonstrated conclusively that the

---

[38] Some of the evidence relating to use of force is relevant to the willfulness assessment. The Court will not repeat that evidence here.

[39] In both trials, after the jurors advised the Court that they could not reach a verdict, the Court instructed the jurors to continue their deliberations and gave the jurors an *Allen* charge before the final round of deliberations. Hence, the Court is confident that jurors voted repeatedly before the Court declared a mistrial at the end of each trial.

defendant repeatedly violated agency policy as he engaged in a pattern of conduct that violated multiple victims' Fourth Amendment rights.  In *Ragsdale*, the defendant made a calculated decision to impose a punishment without a hearing in violation of the defendant's constitutional right to be heard.  In *Reese* and *Johnstone*, the defendant police officers violated the Fourth Amendment rights of many individuals to be free from excessive force by beating individuals who were restrained or otherwise unable to pose any threat to the officers.  Though the Supreme Court reversed the judgment in *Screws* because of an error in a jury charge, the Court made clear that the egregious, despicable conduct of officers who beat to the point of death a man in handcuffs who was accused of stealing a tire would support a conviction under § 242.

Here, unlike the record in *House*, there is no evidence of a pattern of violations of MPD policy.  To the contrary, the evidence demonstrates that Officer Parker complied with MPD policy regarding preliminary investigations of suspicious individuals and MPD's "Response to Resistance" policy.  Unlike the record in *Ragsdale*, the evidence here reveals that Officer Parker made a split-second decision in a rapidly evolving situation rather than a premeditated decision to use violent force.  And unlike the records in *Screws*, *Johnstone*, and *Reese*, the evidence in this case reflects that Officer Parker did nothing to harm Mr. Patel after he took Mr. Patel to the ground.  Instead, when Officer Parker saw that Mr. Patel's

nose was bleeding, he called for medics, and he and Officers Spence and Slaughter tried to get Mr. Patel to his feet and into a patrol car where Mr. Patel would be more comfortable on a very cold day. The Court does not mean to suggest that a single, split-second decision can never arise to the level of a constitutional violation so egregious that it supports a finding of intentional conduct. The record in this case simply is not strong enough to eliminate reasonable doubt. For that reason, the Court grants Officer Parker's renewed motion for judgment of acquittal.[40]

## CONCLUSION

The result in this case is by no means satisfying. Hindsight brings clarity to a calamity. Mr. Patel's celebrated arrival in this country to begin a new life with his son was interrupted in two tragic minutes. If Mr. Parker or Mr. Patel could take

---

[40] Although the Court believes that the judgment of acquittal stands on its own merit, the Court recognizes that on the record in this case, a third trial could trigger Double Jeopardy issues. The "'interest in giving the prosecution one complete opportunity to convict those who have violated [the] laws' justifies treating the jury's inability to reach a verdict as a nonevent that does not bar retrial." *Yeager v. United States*, 557 U.S. 110, 118 (2009) (quoting *Arizona v. Washington*, 434 U.S. 497, 509 (1978)). Thus, a second trial is justified without the defendant's consent when the first trial ends in "a mistrial because the jury is unable to agree." *Downum v. United States*, 372 U.S. 734, 736 (1963). However, "[w]here . . . a mistrial has been declared, the defendant's 'valued right to have his trial completed by a particular tribunal' is []implicated," *United States v. Dinitz*, 424 U.S. 600, 606 (1976). "The underlying idea [of the Double Jeopardy Clause], one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green v. United States*, 355 U.S. 184, 187-88 (1957).

that time back, both would surely do things differently and avoid the events that have forever changed both of their lives.

Mr. Patel had—and has—just as much right to be free from excessive force as every citizen of this country.  He is welcome here, and it is appropriate to grieve his injury.  However, that injury, standing alone, does not provide the basis for a criminal judgment against Mr. Parker under 18 U.S.C. § 242.  The law presumes Mr. Parker's innocence, and the evidence in the record from two trials does not eliminate reasonable doubt as to Mr. Parker's guilt.  Two juries have communicated as much after lengthy deliberations that produced thoughtful questions and, ultimately, deadlock.  The Court has no reason to expect a different result in a subsequent trial given the totality of the evidence that the parties have provided.  The Government has had two full and fair chances to obtain a conviction; it will not have another.[41]

**DONE** and **ORDERED** this January 13, 2016.

_Madeline H. Haikala_
_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[41]  The Court will issue a separate opinion regarding the sealed proceedings in this case.