# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:15-cr-55-MHH-HGD** |
| | } | |
| **ERIC SLOAN PARKER,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Having resolved the renewed motion for judgment of acquittal, the Court turns to the unpublished proceedings in this case.[1]  During the first trial in this case, the Court conducted one closed evidentiary hearing in court and two closed evidentiary hearings by telephone to investigate alleged misconduct by senior officers in the Madison Police Department.  The Court also had a number of closed telephone conferences with counsel pertaining to those hearings.  The Court

---

[1] As explained in much greater detail in the order granting the defendant's renewed motion for a judgment of acquittal, on February 6, 2015, Eric Parker and Andrew Slaughter, patrol officers for the Madison Police Department, encountered Mr. Sureshbhai Patel during a preliminary investigation of a non-emergency call concerning a suspicious person.  During the investigation, Officer Parker took Mr. Patel to the ground.  Mr. Patel hit the ground very hard, either because Officer Parker took him down to the ground with a leg sweep or because Officer Parker lost his balance and fell with Mr. Patel.  Mr. Patel suffered a serious neck injury in the takedown.  In the indictment against him, Officer Parker was charged under 18 U.S.C. § 242 with willfully violating Mr. Patel's right under the Fourth Amendment to be free from a law enforcement officer's use of unreasonable force.  After two trials in which jurors were unable to reach a unanimous verdict, the Court granted Mr. Parker's renewed motion for judgment of acquittal. *See* Doc. 113.

ordered the Clerk of Court to seal the transcripts of the closed proceedings in the court record.  During the second trial, the Court also sealed juror information.  In this opinion, the Court explains the purpose of the closed proceedings and the decision to delay until now the publication of the transcripts from those proceedings.[2]  The Court also explains why it has sealed juror information and the reasons for maintaining the seal.

## I.   STANDARD FOR SEALING PROCEEDINGS DURING TRIAL

It is well-settled that the activities of the courts, particularly trials, "are matters of utmost public concern."  *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 839 (1978).  Both the First and the Sixth Amendments protect the right to a public trial.  *Presley v. Georgia*, 558 U.S. 209, 211-12 (2010) (discussing the Sixth Amendment right of a criminal defendant to an open trial and the First Amendment right of the general public to attend trials).  In addition, the "common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process."  *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001).

---

[2] Throughout this opinion the Court cites to the sealed transcripts by date only.  Upon entry of this opinion, the Court will direct the Clerk of Court to please electronically publish on CM/ECF unsealed versions of the transcripts.  After the Clerk files the unsealed transcripts, the Court will issue a copy of this opinion that contains citations to the unsealed CM/ECF documents and page numbers.  This process may take a few days; the Court will release an opinion with specific record cites as quickly as possible.

"Beyond establishing a general presumption that criminal and civil actions should be conducted publicly, the common-law right of access includes the right to inspect and copy public records and documents." *Chi. Tribune Co.*, 263 F.3d at 1311. But that common-law right "'to inspect and copy judicial records is not absolute.'" *Perez-Guerrero v. U.S. Atty. Gen.*, 717 F.3d 1224, 1235 (11th Cir. 2013) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)).

Similarly, "[t]he press and public enjoy a qualified First Amendment right of access to criminal trial proceedings." *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1028 (11th Cir. 2005). A court has "discretion to determine which portions of the record should be placed under seal." *Perez-Guerrero*, 717 F.3d at 1235. A court's discretion "is guided by the presumption of public access to judicial documents," and that discretion must "be exercised in light of the relevant facts and circumstances of the particular case." *Id.* (internal quotation marks omitted) (quoting *Nixon*, 435 U.S. at 599).

"When sealing proceedings or documents, a court must articulate the overriding interest 'along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" *Ochoa-Vasquez*, 428 F.3d at 1030 (quoting *Press-Enterprise Co. v. Superior Court of Ca., Riverside Cnty.*, 464 U.S. 501, 510 (1984)). "[T]hese findings 'should include the reason for the closure, the evidence that supports the need for the closure, the number of

persons excluded and the number allowed to remain, and the presence or absence of the press.'" *Id.* at 1030 n.16 (quoting *Douglas v. Wainwright*, 714 F.2d 1532, 1546 n.16 (11th Cir. 1983)).

## II.   SEALED PROCEEDINGS – CHIEF MUNCEY AND CAPTAIN COOK

### A. Factual Background Relating to Closure of Investigation

One week into the first trial in this case, the Court received a report that two senior officers in the MPD who were subpoenaed for trial, Chief Larry Muncey and Captain Terrell Cook, may have violated the Court's witness sequestration order.  In addition, Chief Muncey, Captain Cook, and Sergeant Lamar Anderson were alleged to have engaged in conduct designed to intimidate subordinate officers who testified during the first week of trial.  The first episode in the series of events that culminated in these allegations occurred on the first day of trial.

The trial began on September 1, 2015.  Before the Government called its first witness, the parties invoked "the rule."  (Doc. 117, pp. 3-4).  "The rule" is a sequestration order that parties in civil and criminal trials routinely invoke.  The sequestration rule prohibits one witness from hearing the testimony of other witnesses during trial.  Rule 615 of the Federal Rules of Evidence provides the legal framework for "the rule."  Under Rule 615, "[a]t a party's request, the court must order witnesses excluded [from the courtroom] so that they cannot hear other witnesses' testimony. Or the court may do so on its own."  Fed. R. Evid. 615.

Rule 615 describes certain types of witnesses who the Court must except from the sequestration rule.   The rule states that it "does not authorize excluding . . . a person whose presence a party shows to be essential to presenting the party's claim or defense."  Fed. R. Evid. 615.  An expert witness generally falls within the category of witnesses whose presence is essential to presenting a party's claim.  Fed. R. Evid. 615 advisory committee's notes to 1972 amendment ("The category contemplates such persons as . . . an expert needed to advise counsel in the management of the litigation.").

The Government designated Chief Muncey and Captain John Stringer as expert witnesses for the first trial.  (Docs. 35, 41).[3]  At the start of trial, the Government acknowledged that Chief Muncey was both "a fact witness and an expert witness" and asked that the Court allow Chief Muncey and Mr. Parker's expert, Johnny Lee Smith, to remain in the courtroom while other witnesses testified.  (Doc. 117, p. 3).  The Court granted the request and released Chief Muncey and Mr. Smith from the sequestration rule.  (Doc. 117, p. 4).

On September 3, 2015, toward the end of the Government's presentation of evidence, counsel for Mr. Parker asked the Court to exclude Chief Muncey from the courtroom.  Mr. Parker's attorney stated that counsel for the Government had indicated that the Government would not call Chief Muncey as a witness.  Mr.

_____

[3] According to its notices of expert testimony, the Government designated Chief Muncey and Captain Stringer to offer testimony and opinions about the same topics.  (Docs. 35, 41).

Parker's attorney argued that Chief Muncey was "under defense subpoena and the rule has been invoked. We would ask that he be sequestered." (Doc. 66, p. 34). Counsel for the Government replied that while the Government did not plan to call Chief Muncey during its case-in-chief, the Government "anticipated possibly" calling Chief Muncey as a rebuttal expert later in the trial. The Court advised counsel for the Government that if the Government decided not to call Chief Muncey in the Government's case-in-chief, then Chief Muncey would have to comply with the sequestration order and leave the courtroom. (Doc. 66, pp. 34-35). Counsel for the Government chose not to call Chief Muncey, so they instructed him to leave the courtroom.

Later that morning, the Government rested its case, and Officer Parker began presenting evidence. Between September 3 and September 4, 2015, Officer Parker called ten MPD officers to testify. (Doc. 66, p. 3; Doc. 67, p. 3).

On the morning of Saturday, September 5, 2015, counsel for Officer Parker contacted the courtroom deputy to report that he had received information that he believed indicated that senior officers in the MPD may have engaged in conduct that intimidated trial witnesses for the defense. The Court scheduled a telephone conference with all trial counsel to discuss the reported conduct. During the telephone conference, Mr. Tuten, Mr. Parker's lawyer, explained that one of the MPD officers who testified at trial on September 3, 2015, Sergeant Wesley

Grigsby, called him to report that when he returned to the MPD after testifying, Chief Muncey confronted him about his testimony.  (Tr. 9/5/15).  Mr. Tuten stated:

> the chief told Grigsby that he was reviewing the Channel 19 news blog about the case, which apparently quotes -- I have not read any of it -- but it apparently -- it's pretty much a blow-by-blow description of the trial including quotes from questions and testimony that's going out, you know, over this news blog.

(Tr. 9/5/15).    After summarizing Chief Muncey's alleged conversation with Sergeant Grigsby, Mr. Tuten asserted that Sergeant Grigsby described the conversation as "harsh and intimidating," and Sergeant Grigsby purportedly told Mr. Tuten that "he felt that he was being chastised, that he was fearful that he would lose his job and his position as a sergeant."  (Tr. 9/5/15).

In addition, Mr. Tuten read what he described as an email that Chief Muncey sent that purportedly stated:

> Officers, according to WH[NT]-19 and the Huntsville Times, each of you testified under oath that Madison City Police policy supported Parker's use of force on Mr. Patel.  And in the same situation, you would have done the same.  Please, provide me with a written statement explaining if these reports are correct.  If they are not correct, explain what you did say.

(Tr. 9/5/15).  Mr. Tuten alleged that the officers who he called to testify received this email message from Chief Muncey.  (Tr. 9/5/15).

Based on these allegations, Mr. Tuten argued that Chief Muncey's purported conduct violated the Court's sequestration order and that Chief Muncey's

7

purported conduct was impacting Mr. Parker's ability to obtain testimony from MPD officers.  Mr. Tuten stated:

> not only has the chief, you know, violated court orders for sequestration of witnesses, you know he has approached a witness that has already testified to discuss his testimony and he has chastised that officer for giving truthful testimony during court who was there not necessarily voluntarily, but under subpoena to do it. And you know by intimidating these people and threatening them and putting them in a position that they're fearful of losing their job, I don't know if I am going to be able to get truthful testimony from anybody else that I call that's a Madison Police Officer at this point.

(Tr. 9/5/15).

After hearing more about the allegations concerning Chief Muncey and related allegations pertaining to Captain Cook and Sergeant Anderson and consulting with counsel, the Court decided that before the trial could proceed, the Court and the parties would have to investigate the allegations to determine whether there was evidence to support them and, if so, whether the alleged retaliatory conduct had affected any witness's trial testimony.  If it had, the Court would have to consider the possibility of declaring a mistrial.

The Court and counsel for the parties spent the rest of the weekend conferring and making arrangements for a hearing on September 8, 2015.[4]  The Court took steps to ensure that Chief Muncey, Captain Cook, and Sergeant

---

[4] These discussions occurred on Labor Day weekend; the Court scheduled the hearing for the Tuesday following the Labor Day weekend.

Anderson would have counsel for the hearing.  The Court also indicated to counsel that the Court was inclined to close the proceedings, and the Court gave counsel the opportunity to discuss whether the proceedings should be sealed or not.  The Court stated:

> [T]here's been a lot of media coverage for the Parker case and while I feel [the] media should be allowed to participate in the trial proceedings, there is the potential that Chief Muncey could be exposed to criminal charges if the allegations that have been brought to the Court's attention appear to be substantiated by evidence that the Court will hear on Tuesday morning.
>
> And because Chief Muncey has not been charged with misconduct as of yet, I am leaning towards sealing Tuesday's morning proceeding, but I am interested to hear what counsel thinks.

(Tr. 9/5/15).

On September 8, 2015, the Court opened the hearing by gathering input from counsel for the parties about whether the hearing should be closed.  Counsel for the Government stated that the Government would not take a position regarding closure of the September 8, 2015 proceeding (Tr. 9/8/15); however, analogizing the investigatory hearing to a grand jury proceeding, the Government asked that the Court exclude from the courtroom anyone other than a testifying witness and his or her counsel.  Government counsel argued:

> [T]o the extent that a lawyer for a witness who is not on the stand gets to hear the testimony of another witness, I probably would prefer that that not be the way it was done.  I would probably prefer just to have the witness and the fact finder.  And if the Court feels that the attorney for the witness is an appropriate person, then I will leave that to the

9

> Court.  But I think any sort of observers in a sealed hearing probably
> would not be the way to go.

(Tr. 9/8/15).  Counsel for Mr. Parker did not object.

Accordingly, the Court decided to close the investigative hearing.  A number of factors influenced the Court's decision.   First, the Court closed the proceeding to protect the parties' interests in, and Mr. Parker's constitutional right to, a fair trial.  To determine whether evidence indicated that Chief Muncey, Captain Cook, or Sergeant Anderson pressured any witness to change his testimony, the Court had to examine the very witnesses who allegedly were targets of the senior officers' purported pressure tactics.  In addition, Chief Muncey and Captain Cook allegedly were keeping track of officers' testimony by reading media blogs of the testimony.  To provide an environment in which subordinate officers could speak freely about the conduct of senior officers, the Court had to ensure that those senior officers had no access to the information collected during the hearing.  The Court explained its effort to balance the interests of the press (and, by extension, the public) with the necessity for ensuring a fair trial as follows:

> I fully appreciate [the] right [of the press] to be part of the trial.  I am
> just not sure that we can have as effective a hearing this morning as
> we need to have if the press is present.  And these are very serious
> allegations.  And if any officer already has felt intimidated,
> particularly because of information that was acquired by members of
> the department, because of a media blog, it seems to me incumbent on
> us not to allow that situation to occur with respect to these specific
> proceedings, trying to understand whether any witness has been
> influenced -- or someone has attempted to influence any witness.

10

(Tr. 9/8/15).

Beyond having to provide a safe arena for officers to discuss events that allegedly took place at the police department, the Court recognized that the evidence in the evidentiary proceeding potentially could create confusion about or distraction from the trial evidence relating to the charge against Officer Parker. The Court also recognized that if the evidence substantiated the allegations against Chief Muncey, concern about Mr. Patel's civil lawsuit for damages against Officer Parker and the City of Madison may have motivated Chief Muncey's conduct. The Court sought to avoid confusion between the issues in the civil suit and the criminal prosecution. The Court explained:

> I have been concerned since the beginning of the trial about the elephant in the room which is the civil lawsuit. Obviously, some of the testimony that was given last week will have a significant -- or potentially may have a significant impact on the civil trial. And I don't know what all of Chief Muncey's concerns may be, but I suspect part of what I am hearing about, if it proves to be true, may be an attempt to deal with concerns about the civil action.

The Court continued:

> Frankly, that's one of the reasons why I was particularly concerned when information came out last week about how medical bills were being paid; that's for the civil case; that is not for this criminal case. And I want to be clear going forward that there is to be no association between this case and the civil case.

(Tr. 9/8/15).

Finally, the Court recognized that if the evidence concerning Chief Muncey's conduct or the conduct of any other officer required further investigation because the conduct might give rise to criminal charges, any officer who might face criminal charges would be presumed innocent and would have the right to due process of law.  Those constitutional rights might be compromised by premature publication of information relating to potential charges.

Therefore, the Court closed the hearing and adopted the hearing procedure that the Government proposed.  For each witness who testified, the Court excluded from the courtroom everyone other than the attorneys for the Government, Officer Parker and his attorney, and the testifying witness and his attorney, if he had one. (Tr. 9/8/15).[5]

### B. Summary of Sealed Evidence

The evidence in the sealed record pertains to three topics:  Chief Muncey and Captain Cook's alleged violation of the Court's Rule 615 sequestration order, Chief Muncey's alleged efforts to intimidate trial witnesses and to retaliate against those witnesses, and possible efforts by Chief Muncey and other senior personnel in the MPD to influence the testimony of officers who might be called to testify during any of the legal proceedings—civil or criminal—relating to the February 6,

---

[5] A number of the officers who received an email from Chief Muncey about their testimony retained counsel.  (Tr. 9/8/15).

2015 encounter between Mr. Patel and Officers Parker and Slaughter.  The Court addresses those topics in turn.[6]

1.  <u>Rule 615 Evidence</u>

As discussed above, a Rule 615 sequestration order prohibits a witness from hearing the testimony of other witnesses during trial.  Captain Cook was subpoenaed as a trial witness, so he was subject to the sequestration order throughout trial.  Chief Muncey also was subpoenaed as a trial witness, so he was subject to the sequestration order after the Court excused him from the courtroom on September 3, 2015, based on the Government's decision not to call Chief Muncey as an expert witness in the Government's case-in-chief.

The evidence discloses that after the Court ordered Chief Muncey to leave the courtroom, he returned to the police department and began reading media blogs that contained nearly verbatim accounts of the testimony of subordinate officers. (Tr. 9/8/15).  Captain Cook read the blogs, as well.  (Tr. 9/8/15).

In addition, after the Court excluded Chief Muncey from the courtroom, Chief Muncey sent another senior officer to the courtroom to monitor the MPD officers who were testifying during trial.  (Tr. 9/8/15).  Initially, Chief Muncey

---

[6] The Court does not make factual findings regarding the legal significance of the evidence from the sealed proceeding as that evidence pertains to Mr. Patel's civil action against Mr. Parker and the City of Madison or the state's criminal prosecution against Mr. Parker.  The Court simply summarizes the evidence for purposes of explaining why the Court has not published the evidence until now.  This summary presents only one side of the story because Chief Muncey and Captain Cook chose not to testify during the sealed proceedings.  (Tr. 9/8/15).

directed Captain Cook to attend the trial.  The evidence indicates that Captain Cook told Chief Muncey that he could not attend because he was under subpoena, and he would violate the Court's sequestration order if he attended the trial. Consequently, Chief Muncey sent Sergeant Anderson to the courthouse because Sergeant Anderson was not under subpoena.  (Tr. 9/8/15).

Sergeant Anderson testified about his communication with Chief Muncey and Captain Cook from the courthouse.  He explained that during trial, he received an email from Chief Muncey in which Chief Muncey asked, "[H]ow is it going?" (Tr. 9/8/15).  Sergeant Anderson also received a text message from Captain Cook in which Captain Cook asked, "[A]re you keeping the chief updated on everything?"  (Tr. 9/8/15).  When Sergeant Anderson asked Captain Cook what he meant by keeping the chief updated, Captain Cook said, "just kind of keep him apprised of the case."  (Tr. 9/8/15).  When Sergeant Anderson sent a long text describing the events at trial, Chief Muncey sent a response and told Sergeant Anderson that his emails did not have to be as precise.  (Tr. 9/8/15).  According to Sergeant Anderson, Chief Muncey's text also stated:

> We're reading the WHNT-19 blogs, but it does not cover the issues when the jury is out of the room or how our officers are coming across. We just need the important stuff or the embarrassing stuff for future correction.

(Tr. 9/8/15).

14

The record demonstrates that neither the Court nor counsel for the Government explained Rule 615 to Chief Muncey before the Court excused him from the courtroom pursuant to the rule, and counsel for the Government did not explain the rule to Captain Cook.

2.  Evidence Relating to Allegations of Witness Intimidation

As to the allegations of witness intimidation and retaliation, through his attorney, Chief Muncey has acknowledged that he sent two emails to trial witnesses during the first *Parker* trial.  He sent the first email to six officers who testified at trial.  The email states:

> Officers:
>
> According to WHNT 19 and the Huntsville Times, each of you testified under oath that Madison City Police Policy supported Parker's use of force on Mr. Patel, and in the same situation, you would have done the same.   Please provide me with a written statement explaining if theses [sic] reports are correct; if they are not correct, explain what you did say.
>
> Send the reports directly to me (email) within 24 Hours of Parker's case being decided, not before.
>
> Professionally,
>
> Chief, Larry R. Muncey.

(Tr. 9/8/15).

Chief Muncey sent the second email to law enforcement officials in police departments located outside of the City of Madison.  The email concerns Mr.

Smith, the defendant's expert in SSGT training and defensive tactics.  Mr. Smith

provides training throughout the southeast and in other parts of the country.  That

email states:

> Team:
>
> The co-creator of SSGT, Johnny Lee Smith, testified today as an
> expert witness in Eric Parker's federal civil rights case.  When Smith
> was asked about the video of the takedown, he responded that 'he saw
> nothing in the video that went against prevailing police training.'  I
> respectfully disagree with Mr. Smith's conclusion and question
> whether he and his program are the best options for our state's self-
> defense training.  If he sees nothing wrong with Parker's use of force,
> we (State) will certainly revisit issues like this again.
>
> Professionally,
>
> Chief Larry R. Muncey.

(Tr. 9/18/15).[7]  During a closed proceeding that took place between the first and

second trials, counsel for Chief Muncey stated, "It was [Chief Muncey's] intention

from the outset in sending emails to address training matters and liability issues.

It's no secret there's a big lawsuit filed in this case. And part of his job as chief is

to minimize the city and the department's liability."  (Tr. 10/6/15).

 The evidence also indicates that when Corporal Wesley Grigsby returned to

the police department the day after he testified at trial, Chief Muncey confronted

him about his testimony.  Corporal Grigsby testified that Captain Cook called him

---

[7] Although the direct recipients of this email remain unclear, counsel for Officer Parker indicated
that Chief Muncey sent this email to various law enforcement agencies, police academies, and
other people involved in training police officers.  (Tr. 9/18/15).

into Chief Muncey's office.  (Tr. 9/8/15).  Chief Muncey told Corporal Grigsby that he had reviewed portions of Corporal Grigsby's trial testimony on an online blog.  (Tr. 9/8/15).  According to Corporal Grigsby, Chief Muncey expressed disappointment because Corporal Grigsby's testimony made the department look bad.  (Tr. 9/8/15).  Corporal Grigsby testified that Chief Muncey handed him a folder that contained records of Corporal Grigsby's training along with the department's expenses associated with that training.  (Tr. 9/8/15).  Corporal Grigsby testified that his encounter with Chief Muncey made him feel "[n]ervous. Very, very nervous . . . ."  (Tr. 9/8/15).  Corporal Grigsby stated that he left work early that afternoon because he knew that he would not be productive.  (Tr. 9/8/15).

Corporal Grigsby was one of several officers who testified that Chief Muncey's conduct made them nervous and caused them to fear reprisal for their testimony during the first trial.  (Tr. 9/8/15).  One officer, Officer Campbell, stated that he feared retaliation or repercussions before he testified at Officer Parker's trial, and this was a fairly prevalent feeling in the Madison Police Department.  (Tr. 9/8/15).  Various officers testified that Chief Muncey and Sergeant Anderson's presence in the courtroom during their trial testimony made them feel uneasy.  (Tr. 9/8/15).  Sergeant Marc Bray stated that there was a sense in the Madison Police Department that Chief Muncey may have been trying to intimidate officers who

17

testified at Officer Parker's trial and that the climate of the Madison Police Department had been "really tense" since the beginning of the trial.  (Tr. 9/8/15).  He added, "I know the first few days when [Chief Muncey] was here, I was afraid I was going to be called to testify and I would not want to give testimony with him sitting here."  (Tr. 9/8/15).[8]

3. Evidence Relating to Efforts to Either Educate Officers or Influence Officers' Testimony

During his testimony in the sealed hearing, Sergeant Anderson described meetings at the Madison Police Department during which officers studied the video footage of Officer Parker's takedown of Mr. Patel.  The first was a meeting of MPD supervisors.  Sergeant Anderson described the meeting this way:

> Yeah, we actually, as a supervisory staff, we got together and as far as, you know, tried to interpret the law to the best of our ability. Open forum, very relaxed, and we got up and we actually talked about it. And that was the chief and the major -- I mean, we stood up there hours, trying to get all the supervisors on the same -- you know, on the same wavelength, so when we communicated to the officers. And we were also told to take it back to show the video to your officers and welcome their comments and try to educate them.

---

[8] Sergeant Bray was not called as a witness during the first *Parker* trial.  He did testify during the second trial.  (Doc. 106, pp. 161-82).

One witness provided testimony during a telephone conference a few days after the September 8, 2015 hearing.  That witness was not available on September 8, 2015 for personal reasons.  (Tr. 9/9/15).

A few days after the jury in the first trial deadlocked, the Court held another telephone conference to examine Mr. Smith about the email that Chief Muncey sent to various police departments pertaining to Mr. Smith's trial testimony.  (Tr. 9/18/15).

(Tr. 9/8/15).   MPD supervisors then conducted a meeting or meetings with subordinate MPD officers.  When asked whether the meetings with officers were "an attempt to change officers' minds about what had happened," Sergeant Anderson replied:

> It wasn't an attempt to change. It was more like an open forum. It was more like an open forum to us to try to get on one sheet of music. That was my perception of it as I thought we were all on.  No more questions.  Does everybody understand?  I thought we were all on one cord, but no one tried to persuade me.

(Tr. 9/8/15).   Sergeant Anderson stated that after these meetings, "everyone seemed to be in agreement" that "the force was not reasonable."  (Tr. 9/8/15).

Sergeant Anderson testified that he felt that a number of officers who were "in an agreement in the supervisory's [sic] meeting" changed positions when they testified at trial.  (Tr. 9/8/15).  During the first *Parker* trial, Sergeant Anderson met several times with Chief Muncey and other high-ranking officials at the Madison Police Department to discuss whether officers' actual trial testimony comported with the recitation of the testimony that appeared in an online blog.  (Tr. 9/8/15). Sergeant Anderson stated that he was not aware of Mr. Patel's civil lawsuit, but he felt that a number of the officers who testified embarrassed the department.  (Tr. 9/8/15).

### C. Counsels' Positions Regarding the Sealed Evidence.

During the first trial, counsel for the Government argued that the Court should refrain from commenting upon or allowing the introduction of evidence regarding the closed proceedings because that evidence might prejudice Chief Muncey in potential future criminal proceedings. (Tr. 9/8/15). The Government moved to exclude the sealed evidence from the second trial pursuant to Rule 403 of the Federal Rules of Evidence, arguing that the evidence would distract jurors from their consideration of matters pertaining to Officer Parker's culpability. (Doc. 81; Tr. 10/6/15). Counsel for Mr. Parker argued that the Court should allow the parties to introduce the evidence at trial. (Tr. 9/8/15; Tr. 10/6/15).

There is no doubt that the evidence from the closed hearings was relevant to the Government's charge against Officer Parker. On the one hand, jurors could infer from the sealed evidence that Officer Parker's conduct, assuming he used a leg sweep and did not simply fall to the ground, violated MPD policy, and the department acted quickly to correct the violation and to prevent future violations by other officers. Jurors also could infer that many officers were disgruntled about the way in which the MPD handled its investigation of Officer Parker. On the other hand, jurors could infer from this evidence that Officer Parker's conduct was consistent with MPD policy, and senior MPD officers tried to ensure that no officer would give testimony to that effect because such testimony might expose the City of Madison to a civil damages award.

At the very least, evidence that MPD supervisors had to discuss the dashcam video of the takedown for "hours" amongst themselves and then have lengthy reviews of the video with subordinate officers is relevant because it suggests that the MPD's response to resistance policy was anything but clear. Jurors could reasonably infer from this evidence that even if Officer Parker did use a leg sweep to take Mr. Patel to the ground, Officer Parker's conduct was not willful because the MPD failed to train Parker and other officers in the constitutional boundaries for use of force. This evidence is consistent with trial evidence that demonstrated that in the two years after he graduated from the police academy, Officer Parker received only one use-of-force training opportunity. A few months before his encounter with Mr. Patel, Officer Parker attended a seminar called "Safe Neighborhoods." During the seminar, officers viewed video clips of police officers being hurt or killed and discussed steps that officers should take for their safety. (Doc. 106, pp. 39-40; Doc. 107, pp. 6, 9-11, 14-16, 30).

In addition, the sealed evidence is relevant to jurors' assessment of the credibility of a number of trial witnesses. From evidence of efforts of senior officers within the MPD to make sure that all officers were "on the same wavelength" and "on one sheet of music" and "in agreement" that the force that Officer Parker used was unreasonable, jurors reasonably could question the credibility of the more senior officers who testified. Conversely, the evidence that

subordinate officers who Mr. Parker called at trial received emails from Chief Muncey requesting an explanation of their testimony and faced possible "future correction" might bolster the credibility of those witnesses in the eyes of jurors. That potential credibility evidence coupled with the evidence from the sealed proceedings would have allowed counsel for Officer Parker to argue that the MPD tried to portray Officer Parker as a rogue officer to protect the department's reputation and insulate the City of Madison from a civil damages award. In this regard, the record also indicates that Mr. Patel did not initiate the state misdemeanor assault charge against Officer Parker; Captain Cook completed the paperwork to initiate the state misdemeanor charge. (Tr. 9/8/15). Had all of this evidence been before them, jurors reasonably could have concluded that Officer Parker was not a rogue officer but instead was a second year police officer with virtually no post-academy training who reasonably believed that he was complying with the MPD's response to resistance policy, and jurors, in turn, reasonably could have concluded that Officer Parker did not willfully deprive Mr. Patel of his constitutional right to be free from excessive force. (*See* Doc. 113, pp. 53-91).

Although the sealed evidence is relevant, the Court ultimately ruled in favor of the Government and excluded all of the sealed evidence from both trials pursuant to Rule 403 because the Court believed that the evidence might shift the

focus of the trials from Officer Parker to Chief Muncey and other senior officers.[9] The Court also had to consider the fact that the Government might have difficulty responding to the evidence because Chief Muncey and Captain Cook did not testify in the sealed hearing.  (Tr. 9/8/15).  The Court made the transcripts of the sealed testimony available to counsel for the limited purpose of impeachment during the second trial but advised counsel for Officer Parker that if he believed the Government opened the door to the introduction of that evidence, he would have to approach the bench and ask for permission before mentioning the sealed testimony in the presence of the jury.  (Tr. 10/26/15).  The Court also used information from the sealed transcripts to give instructions to witnesses before the second trial (*see* p. 26 below) and to issue an order regarding the use of electronic devices in the courtroom during the second trial (*see* p. 28 below).

### D. Reasons for Publishing the Sealed Evidence Now

There are several reasons why it is appropriate for the Court to publish the sealed investigative proceedings now.  First, because the Court granted Officer Parker's renewed motion for judgment of acquittal, potential confusion of the issues in this case and in Mr. Patel's civil action for damages no longer is a concern.  (Doc. 113).

---

[9] Rule 403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Second, the resolution of the federal criminal charge against Mr. Parker clears the way for Mr. Patel's civil suit for damages to proceed. The civil action has been stayed (i.e. placed on hold) pending resolution of the federal criminal prosecution. Mr. Patel's suit for damages is different from this criminal matter. The parties are different, the legal theories are different, some of the evidence is different, and Mr. Patel's burden of proof in a civil action is different from the Government's burden of proof in the federal criminal prosecution.[10] Evidence from the sealed proceedings is potentially relevant to and possibly admissible in the civil proceeding. Therefore, the parties in that proceeding should have access to the sealed evidence, so that they may pursue that evidence in discovery if they wish.[11]

Finally, the Court has kept counsel for Chief Muncey and Captain Cook informed of the process that the Court has undertaken to determine the proper time to publish the sealed evidence. The Court has given counsel for Chief Muncey and

---

[10] The judgment of acquittal in this federal criminal prosecution means only that the Government did not provide sufficient evidence to prove beyond a reasonable doubt that Officer Parker violated 18 U.S.C. § 242 by willfully using unreasonable force. The judgment of acquittal under the federal criminal statute does not mean that Mr. Parker and/or the City of Madison may not be held civilly liable for damages for Mr. Patel's injuries. Similarly, the judgment of acquittal based on the federal charge under 18 U.S.C. § 242 does not bar the state criminal prosecution for misdemeanor assault under Alabama law.

[11] The Court expresses no opinion about the order in which the federal civil action and the state criminal prosecution against Mr. Parker should proceed, and the Court expresses no opinions about the merits of the claims and charges in those actions or the extent to which any of the evidence from the sealed proceedings is admissible in another case.

Captain Cook an opportunity to review the sealed evidence, and counsel for Chief Muncey and Captain Cook have consented to the publication of that evidence. (*See*, *e.g.*, Doc. 82; Tr. 11/23/15).   Therefore, Chief Muncey and Captain Cook have waived any due process concerns that they may have concerning the publication of the evidence.

Now that the barriers to publication of the sealed transcripts concerning the evidentiary proceedings have been eliminated, the Court will provide public access to the transcripts in the Court's electronic record.   The Court will initiate proceedings pursuant to Rule 42 to examine whether conduct by Chief Muncey and Captain Cook violated the Court's Rule 615 sequestration order during the first *Parker* trial.   Fed. R. Crim. P. 42.   To enable Mr. Patel's civil action to proceed without the complications that a broader criminal investigation might create, the Court will delay a decision about a request for a criminal investigation of alleged witness tampering.[12]

By separate order, the Court will provide to Chief Muncey, Captain Cook, and the witnesses in the sealed hearings instructions about their ability to discuss their testimony in those hearings.   By separate order, the Court will provide

---

[12] The September 11, 2015 transcript contains discussions pertaining to procedural aspects of an order asking the Government to investigate possible criminal conduct relating to intimidation of or retaliation against trial witnesses.  The Court has redacted that information from the transcript because it is premature to disclose that information now.

instructions to the Clerk of Court relating to the publication of the sealed transcripts.

### E. Findings Regarding the Sealed Proceedings

Although the Court is not in a position to make findings about the legal significance of the conduct discussed in the sealed proceeding, the Court does make findings about the extent to which that conduct impacted the two criminal trials in this case. During the first *Parker* trial, the Court found that no witness in that trial changed his testimony because of possible repercussions from senior officers in the MPD. (Tr. 9/8/15). The Court accepts the witnesses' representations that the pressure they felt within the police department did not change their trial testimony. (Tr. 9/8/15).

Before the second *Parker* trial began, the Court met with all of the witnesses from the sealed proceedings. The Court assured those witnesses that neither Chief Muncey nor any other officer would retaliate against them for their testimony during the trial. The Court met separately with Chief Muncey and Captain Cook and obtained their assurances that they would not contact, and they would not direct anyone else to contact, subordinate officers about those officers' trial testimony. The Court advised Chief Muncey and Captain Cook that they should refrain from reviewing press coverage of the second trial to avoid even the appearance of impropriety. (Tr. 10/26/15). The Court has received no evidence

that indicates that anyone attempted to influence the testimony of any witness in the second *Parker* trial.

The sealed proceedings greatly disrupted the first trial, and the evidence from the sealed proceedings created issues for both trials. Nevertheless, the Court finds that both trials were fair to the Government and to Mr. Parker. Although admission of relevant evidence concerning post-February 6, 2015 meetings at the MPD may have helped the Government carry its burden of proof, the evidence also may have made it more difficult for the Government to persuade jurors beyond a reasonable doubt that Officer Parker willfully violated Mr. Patel's rights under the Fourth Amendment. The Government asked the Court to exclude the evidence, and the Court does not believe that it abused its discretion by doing so. (Tr. 9/8/15). In any event, the point is now moot.

Because media blogs were the vehicle through which Chief Muncey and Captain Cook learned about officers' trial testimony, the Court prohibited the use of electronic devices during the second *Parker* trial. (Doc. 93). The Court first raised the issue of excluding electronic devices with the parties during a September 21, 2015 telephone conference. In that discussion, the Court noted that it was "trying to strike the balance between the press' [sic] interest in and general right to report on [the trial] and the concerns that the blogging creates." (Tr. 9/21/15). The

Court discussed the topic with counsel again during an October 6, 2015 pretrial conference:

> . . . my plan is to tell members of the press that they may have old-fashioned yellow pads and take notes at trial. But I am concerned that if anybody has a computer or any sort of electronic device, a tablet, a cell phone, that the Court just can't monitor and control what's being issued from the courtroom.
>
> So the Court's thought is that it will limit members of the press to taking notes here in the courtroom, and then the press can file reports as soon as they leave the courtroom. That would eliminate I believe the issues with respect to blogging. I intend to explain to the members of the press why I am doing that. That necessitates a discussion, at least in a global sense, of what happened in the sealed proceedings.

(Tr. 10/6/15).

The Court issued a written order on October 26, 2015 that prohibited the use of electronic devices during trial. In the order, the Court explained that live blogs during the first trial provided sequestered witnesses with what amounted to a daily trial transcript. Relying in part on a Fifth Circuit Court of Appeals holding that is binding on this Court, the Court stated:

> The purpose of the sequestration rule is to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion. *Taylor v. United States*, 388 F.2d 786 (9th Cir. 1967); *United States v. Leggett*, 326 F.2d 613 (4th Cir.), *cert. denied*, 377 U.S. 955, 84 S.Ct. 1633, 12 L.Ed.2d 499 (1964). The opportunity to shape testimony is as great with a witness who reads trial testimony as with one who hears the testimony in open court. The harm may be even more pronounced with a witness who reads trial transcript than with one who hears the testimony in open court, because the former need not rely on his memory of the testimony but can thoroughly review and study the transcript in formulating his own

> testimony.   The court properly held that providing a witness daily
> copy constitutes a violation of Rule 615.

(Doc. 93, p. 3) (quoting *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1373

(5th Cir. 1981)).   The Court also found that the live blogs violated the principle of

the Court's Local Rule 83.2, which prohibits recording of trial proceedings.   (Doc.

93, p. 3).   The Court finds that the restriction on electronic devices struck a fair and

appropriate balance between the right of access of the press to the criminal

proceedings and the Court's obligation to enforce its sequestration order.

## III.   SEALED PROCEEDINGS – JUROR INFORMATION

### A. Factual Background Relating to Sealing of Juror Information

To account for the significant pretrial publicity relating to this case, the

process of identifying and selecting impartial jurors for both trials was painstaking

and exhaustive.   "[T]he right to jury trial guarantees to the criminally accused a fair

trial by a panel of impartial, 'indifferent' jurors," and an impartial jury's verdict

"must be based upon the evidence developed at the trial."   *Irvin v. Dowd*, 366 U.S.

717, 722 (1961) (citations omitted).

The law does not require that jurors have no pre-trial exposure to media

coverage of a high profile case.   Instead, the law requires jurors to set aside any

prejudgments that they may have made about innocence or guilt and base their

verdict solely on the evidence presented during trial.   As the Supreme Court stated

in *Irvin*:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722-23.

Before the first trial in this case, counsel for both parties acknowledged that the significant media coverage might affect the ability of potential jurors to be objective.  (Doc. 114, pp. 6-9).[13]  To help the parties evaluate the effect of media coverage on potential jurors, the Court took a number of steps.  Before the first trial, to help the parties identify jurors who may have made up their minds about guilt or innocence before hearing the trial evidence, the Court worked with counsel to develop a short written questionnaire designed to measure exposure to media coverage and the impact of that coverage on a potential juror.  (Doc. 115, pp. 3-6).  The Court also directed the Clerk of Court to call 55 individuals for jury selection; the Court ordinarily calls approximately 35 people for jury selection in a criminal

---

[13] On February 12, 2015, the MPD released the dashcam video recording of Officer Parker's February 6, 2015 takedown of Mr. Patel.  Media outlets repeatedly replayed the recording, and the video was available on the internet.  (Tr. 10/26/15).

case.   (Doc. 114, p. 8; Doc. 115, p. 6).[14]   Finally, the undersigned judge and Magistrate Judge Harwell Davis held a hearing with counsel to discuss in detail the jury selection process.  (Doc. 47, pp. 5-10; Doc. 115, pp. 6-7).

On the first day of the first trial, Judge Davis administered the written questionnaire to the members of the venire.  (9/1/15 Minute Entry).  The Court gave the parties hours to study the responses to the written questionnaires before conducting voir dire in open court.[15]   After the attorneys questioned potential jurors in open court, the Court allowed counsel to question members of the venire individually in chambers so that counsel could ask potential jurors questions about their responses to the written questionnaires and to some of the oral questions posed during voir dire.  The Court then allowed counsel to evaluate overnight the responses to the written questionnaires and all of the information collected in voir dire before striking the jury on the second day of trial.  (9/2/15 Minute Entry). Based on the information that the attorneys developed during voir dire, the Court granted the parties' motions to strike five potential jurors for cause.  After the

_____

[14] The Clerk actually summoned 56 citizens for jury duty.

[15] "Voir dire" is a French term.  It means "to tell the truth."  Voir dire is the process by which attorneys for the parties have an opportunity to meet a pool of potential jurors and ask the members of the jury pool questions designed to enable the parties to select a jury well-suited to try the issues in a particular case.

parties exercised their peremptory strikes, the Court seated twelve jurors and two alternate jurors.[16]

At the close of the evidence, the Court instructed the jurors on the law and released the alternate jurors.  During two days of deliberations, the jurors asked questions and sent notes to report that they were deadlocked.  (Docs. 52-56).  The Court declared a mistrial after the jury foreperson reported for the fourth time that the jurors were deadlocked.  (Doc. 71, p. 62).

On September 17, 2015, less than a week after the first jury could not reach a verdict, the Court learned that a local columnist published an article entitled "Why I Grieve Over the Racially Split Hung Jury in Madison Cop Trial."  The editorial appeared on AL.com, a media outlet for Northern Alabama. (http://impact.al.com/opinion/print.html?entry=/2015/09/why_i_mourn_the_racially_divid.html, last visited January 24, 2016).  The column states:

> [another reporter] learned when he talked to jurors this week, those who were black – two jurors and an alternate – thought Parker guilty of a civil rights charge when he partially paralyzed Sureshbhai Patel. The 10 men who were not black – I can't say for sure they are Caucasian but they look that way – were convinced no crime was committed.[17]

---

[16]   In a criminal case, the parties select alternate jurors who listen to all of the evidence.  The alternate juror(s) participate in deliberations only if one or more of the original twelve jurors become unable to complete the deliberation process.

[17] The article may suggest to readers that 13 jurors rendered a verdict in the first *Parker* trial. Twelve jurors deadlocked in the first trial. Twelve jurors began deliberating on September 9, 2015.  On September 10, 2015, the Court dismissed one of the jurors for reasons personal to him. (Doc. 70, pp. 3, 9).  The first alternate juror joined the eleven remaining jurors, and the Court

. . .

We are so divided. We are so hopelessly split at this moment in this country that as a society we are just like this hung jury.  We cannot agree what justice looks like.  We cannot agree what is right and what is wrong, what is acceptable and what is not.  We cannot agree in Florida or New York, in Ferguson or in Baltimore. And we sure cannot agree in Alabama.

Even though the shocking video is there for all to see, showing Parker as he approached the unarmed and mystified Indian man walking down a Madison sidewalk.  Even though it shows how Parker became frustrated when Patel did not respond to his English commands.  Even though it shows in graphic and horrifying detail how Parker then slammed Patel to the ground.

Even though, even though, even though.

Even though a police captain testified to this jury that Parker's actions were wrong.

"I saw no indications of resistance, or active resistance or aggressive resistance," Capt. John Stringer said.

But then a string of police officers, a thick blue line of cops testified they saw nothing at all wrong with Parker's actions, that cops are trained to take down a subject in that situation.  Which, if true, is as frightening as the video itself.

But those 10 guys bought it.  And hung the jury.

---

instructed the reconstituted jury to start deliberations over again.  (Doc. 70, pp. 9-10).  After two days of deliberations and after the Court gave an *Allen* charge (i.e. a charge that "instructs a deadlocked jury to undertake further efforts to reach a verdict." *United States v. Bush*, 727 F.3d 1308, 1311 n. 1 (11th Cir. 2013) (internal quotations omitted)), the twelve jurors announced that they were deadlocked and would not be able to return a verdict.  (Doc. 71, p. 51).  Of the twelve jurors who deadlocked, two were African-American.  The reporter who initially wrote about the racial breakdown of the jury's vote apparently spoke to an alternate juror who did not participate in the jury's deliberations.

And in the process these Parker peers gave a stamp of approval to violently slamming a 57-year-old to the ground when he could not understand the language.

In the process this jury sent a message that such force is A-OK, that it's a tactic justified and justifiable in the most mundane of police encounters.

. . .

The one thing that is black and white is that this should not be an issue of black and white.

(http://impact.al.com/opinion/print.html?entry=/2015/09/why_i_mourn_the_raciall r_divid.html, last visited January 24, 2016).

The Court fully acknowledges the right of the columnist to write this article, just as the Court recognizes the right of every individual to share the columnist's views or to hold and express any other opinion about the jurors' deliberations and every other aspect of this case.  The First Amendment guarantees those rights, and federal courts preserve those rights when those rights are challenged in court.  The columnist was doing his job.  Nevertheless, the Court had practical concerns about the impact that the article might have on the second trial that the Court was preparing to schedule.  At a minimum, the commentary expresses a view that the jurors' deliberations in the first trial were racially tinged; at worst, the commentary expresses a view of outright racial bias.  Such public accusations of racial bias had the power to influence jury selection and jury deliberations in the second trial.

The Court advised counsel of its concern about jury selection during a September 21, 2015 hearing.  When the Court raised the editorial article, counsel brought to the Court's attention an article by another reporter that discussed the racial breakdown of the deadlocked jury in the first *Parker* trial.  (Tr. 9/21/15).[18] Referring to the editorial column, the Court stated:

> This article was published as an editorial article on September 17th in AL.com; and frankly, it is of concern to the Court.  It is troubling. The article for the record -- and I will make the article -- a copy of the article Court's Exhibit 1 to this proceeding.  The article discusses what [the columnist] believes was the breakdown in the vote on the jury. He characterizes the breakdown of the vote as a racial breakdown  . . .   And he says that the verdict in a case like this should not be a racial issue which raises a number of issues in the Court's mind.
>           . . . .
>
> Well, with respect to what we have to do to choose a jury for retrial, one of the Court's concerns about this article is the chilling effect it can have on individuals' willingness to serve on a jury in this case.

(Tr. 9/21/15).

Of course, jury service is not voluntary in this country.  When summoned, absent extenuating circumstances, citizens are obliged to appear for and participate in the jury selection process, and if chosen, a citizen must serve.  28 U.S.C. § 1861 ("It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district

---

[18] *See Deadlocked Jury Favored Acquittal for Officer who Slammed Down Indian Grandfather*, (September 15, 2015), http://www.al.com/news/index.ssf/2015/09/hung_jury_favored_officer_ on_t.html.

courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose."); *see also* 28 U.S.C. § 1866.  Jury service is one of the highest civic obligations of a citizen in this country, and next to military service, it can be one of the most challenging.  *Powers v. Ohio*, 499 U.S. 400, 407 (1991) ("Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process.").  Because it can be so challenging, individuals sometimes are reluctant to serve on a jury.  That reluctance may intensify in a high profile case because jurors in a high profile case recognize that their decision will receive substantial public scrutiny.  Such reservations are routine, and judges and lawyers are equipped to address them.

The September 17, 2015 editorial is more than what most jurors bargain for in terms of scrutiny.  The editorial does not merely criticize the decision; it criticizes and labels the jurors who found that the Government had not carried its burden of proof.  An article such as this has a tendency to make individuals think twice about serving on a jury in a high profile case like this one.  To avoid service, individuals may state their unwillingness explicitly—as more than a dozen members of the venire in the second trial did—or they may demonstrate their reluctance to serve in other ways during the jury selection process.  (Tr. 10/26/15).

Individuals' reservations about serving as jurors add challenges to an already complex and arduous jury selection process.

More troubling is the possibility that fear of labeling might cause a juror to cast a vote during deliberations to avoid accusations of racial bias or to address other concerns about public scrutiny of jury deliberations.  As the Court instructed the juries in both trials, a verdict in this case had to be based on the evidence; the verdict could not "be influenced in any way by either sympathy for or prejudice against the defendant Mr. Parker or the government."  (Doc. 69, pp. 146-47; Doc. 107, p. 138-39).[19]

To try to minimize the chilling effect that the articles about the first verdict might have, the Court took a number of steps.  First, the Court advised counsel that they would have to use numbers rather than names during voir dire in the second trial.  (Tr. 9/21/15).  Second, Judge Davis added a question to the written juror questionnaire designed to assess the extent to which media coverage during and after the first trial may have impacted potential jurors' abilities to consider the evidence in the second trial objectively.  (Tr. 9/21/15).[20]  Third, the Court asked the

---

[19] This is a pattern instruction that courts give in virtually every jury trial, civil or criminal. *See* Eleventh Circuit Pattern Jury Instruction 2.2 (2010).

[20] The question was designed to capture information not only about potential jurors who may have been influenced by the articles that were published in the wake of the first mistrial but also to identify potential jurors who may have read the blogs of evidence that were posted during the first trial.  (Tr. 9/21/15; Tr. 10/6/15).

Clerk to summon a larger jury pool for the second trial. The Clerk summoned 76 potential jurors, more than double the number of individuals that the Court ordinarily would call for a criminal trial. Finally, during jury selection, when issues concerning potential racial bias on the part of both parties arose, the Court referred to its pretrial remarks concerning the media's characterization of the jurors' deliberations in the first trial and made clear that conduct by counsel that might give rise to future racial inferences about juror deliberations would not be tolerated.[21] The law in this Circuit states:

---

[21] When selecting a jury, parties initially may ask the Court to eliminate from the pool of potential jurors individuals who may not be able to decide the case on the basis of the evidence and the instructions on the law. These are called strikes for cause. Attorneys must be able to point to information in the voir dire record that supports a motion to strike for cause. After the pool of potential jurors is narrowed by strikes for cause, attorneys have the opportunity to exercise peremptory strikes. Counsel do not have to explain their reasons for these strikes unless opposing counsel challenges the strikes. A *Batson* challenge to peremptory strikes is a challenge based on the United States Supreme Court's opinion in *Batson v. Kentucky*, 476 U.S. 79 (1986). In that decision, the Supreme Court reaffirmed that the Equal Protection Clause prohibits an attorney from excluding a potential juror from jury service on account of race. *Id.* at 84. The discussions about race during jury selection in the second *Parker* trial pertained to *Batson* challenges that each party made with respect to the other's peremptory strikes. After lengthy discussion, the Court overruled both the Government's *Batson* challenge and Mr. Parker's *Batson* challenge.

The jury that the Court seated for the second *Parker* trial reflected the pool from which the jury was selected. After the Court excused a number of potential jurors on the basis of hardship for health and family reasons and the Court granted motions to strike three potential jurors for cause, the jury pool consisted of 52 individuals, 11 of whom were African-American. The final jury was composed of eight Caucasians, two men and six women, and four African-Americans, one man and three women. There were two alternate jurors; one was African-American, and the other was Caucasian. Neither alternate juror participated in jury deliberations. (Tr. 10/27/15).

Any attempt by any party in any case to produce a particular verdict by manipulating the racial composition of a jury runs afoul not only of the Equal Protection Clause but also of the fundamental respect that the rule of law provides to individuals. Such a strategy is based on the flawed notion that the diverse perspectives that jurors bring to the evidence in a case can be

In evaluating the facts of a case, the law permits jurors to "apply their common knowledge, observations and experiences in the affairs of life." *United States v. Cruz-Valdez,* 773 F.2d 1541, 1546 (11th Cir.1985) (en banc) (citations omitted). Such an instruction recognizes that in assessing credibility or the reasonableness of a position, people inherently apply conclusions about human behavior based on *common experiences of daily living.* For example, jurors may use "common sense," derived from the repetitive pattern of human behavior and experiences common to all of us, in discerning the reliability of a person who gives conflicting testimony. However, the law does not permit jurors to construe accounts of current events, gleaned from sources extraneous to the case record (such as newspapers), as somehow applicable to the question of a particular defendant's guilt or innocence. A jury cannot appropriately reason that a particular defendant is guilty based on media reports of rampant drug use coupled with the fact that the defendant is accused of a drug crime. The prosecutor's comment in this case draws upon widespread community fears about drugs, and implies that those fears can or should inform the process of assessing Gainey's guilt. In other words, the reference invites the jury to judge the case upon standards and grounds other than the evidence and law of the case, and is thus objectionable and improper. *United States v. Beasley,* 2 F.3d 1551 (11th Cir.1993); *Arrieta-Agressot v. United States,* 3 F.3d 525 (1st Cir.1993); *United States v. Johnson,* 968 F.2d 768 (8th Cir.1992); *United States v. Solivan,* 937 F.2d 1146 (6th Cir.1991). We caution counsel from employing arguments immaterial to the defendant's guilt or innocence, especially when they appear calculated to "shift the emphasis from evidence to emotion." *United States v. Doe,* 903 F.2d 16, 25 (D.C.Cir.1990) (racial bias appeal in prosecutor's closing argument was reversible error).

---

collapsed into the single dimension of race. The law abides no such assumptions. Moreover, practice defies such projection as racially diverse juries return verdicts every day in all manner of cases, including cases in which race is an element of a criminal charge or civil claim. There simply is no place for racial bias in jury selection or in any other part of a trial.

*U.S. v. Gainey*, 111 F.3d 834, 836 (11th Cir. 1997), *cert. denied*, 522 U.S. 962 (1997) (emphasis in *Gainey*).[22]   The Court's cautionary statements to counsel for both parties about invocations of race during the second trial are consistent with this binding precedent.[23]

The Court notes that the record from the first trial indicates the members of the jury made a good-faith effort to discharge their duty.   The record discloses specific issues that the jurors wrestled to resolve.   During their deliberations, the jurors asked:   "What legal justification does a police officer need to physically prevent a person from walking away and patting him down?" and "Is it against the law for Mr. Patel to leave the house without identification and/or a green card?" (Doc. 53).   The jurors asked additional questions after the Court declared a

_____

[22] By analogy, neither jury in this case could appropriately reason that Mr. Parker was guilty of the charge under § 242 based on media reports about excessive use of force by other law enforcement officers.   Public outrage concerning excessive force is legitimate and consistent with the law.   The law condemns a law enforcement officer's use of unreasonable force.   But comments or arguments that infer that these sentiments "should inform the process of assessing" Mr. Parker's guilt under § 242 are improper and may constitute reversible error, particularly when the Court has cautioned counsel for both parties to steer clear of such topics.

[23] Racial discrimination or discrimination against a non-citizen can provide the basis for a charge under § 242.   *See* Doc. 113, p. 1 for the full text of 18 U.S.C. § 242.   Based on the language of § 242 and the Court's pretrial review of the Government's enhanced dashcam video, the Court mistakenly assumed that the Government would attempt to prove that Officer Parker used force against Mr. Patel either because of Mr. Patel's ethnicity or because Mr. Patel was not a citizen of the United States.   During the first trial, the Court asked the Government whether it had to establish either racial discrimination or discrimination on the basis of alienage to prove its case against Mr. Parker.   The Government explained that it was not pursuing such a theory against Mr. Parker.   (Doc. 68, pp. 282-85).   In both trials, the Government attempted to prove that Officer Parker used an unreasonable amount of force against Mr. Patel because Officer Parker was frustrated with Mr. Patel.   (*See, e.g.*, Doc. 66, pp. 102-15; Doc. 69, pp. 155-82; Doc. 107, pp. 168-70).   As a consequence, neither racial discrimination nor discrimination against an alien was a legal issue for the jury's consideration.

mistrial.  With the consent of counsel for the Government and for Mr. Parker, the undersigned visited with the jurors briefly in the jury room before the Court released the jurors.  After thanking the jurors for their service, the Court asked if any of the jurors had questions about trial procedures that the Court might be able to answer.  A juror asked where Officer Slaughter was.  Officer Slaughter is the MPD officer who participated with Officer Parker in the investigatory stop of Mr. Patel.  A juror explained that Mr. Patel's hands were not visible in the dashcam video, and Officer Slaughter would be able provide testimony about the position of Mr. Patel's hands before the frisk and takedown.[24]  After leaving the jurors, the undersigned met with counsel and reported, "the jurors' big question was where is Officer Slaughter?"  (Tr. 9/11/15).[25]

---

[24]  The Court did not answer the jurors' questions about Officer Slaughter's whereabouts.

[25]  Early in the case, the Court questioned the inferences that jurors might draw from Officer Slaughter's absence from the trial and asked counsel to prepare an instruction to address the topic.  (Doc. 47, pp. 36-41). After hearing from the jurors from the first trial after they deadlocked, the Court reminded counsel for the Government a number of times of the potential importance of Officer Slaughter's testimony in the second trial.  (Doc. 91, pp. 11-12; Doc. 106, pp. 7-8; Tr. 9/8/15 pp. 137-40).  By statute, for reasons that the Court will not explain at length, neither Mr. Parker nor the Court had the power to compel Officer Slaughter to testify at trial.  Only the Government was authorized to do that, and that decision was entirely within the Government's discretion.  18 U.S.C. § 6002; *see United States v. Merrill*, 685 F.3d 1002, 1015 (11th Cir. 2012) ("[F]ederal courts . . . have no authority to grant witnesses . . . use immunity. Congress has placed the power to grant use immunity exclusively in the Executive Branch.") (quoting *Grand Jury Proceedings (Williams) v. United States*, 995 F.2d 1013, 1017 (11th Cir.1993)); *Grand Jury Proceedings (Williams) v. United States*, 995 F.2d 1013, 1018 (11th Cir. 1993) ("While a district court can issue Rule 26(c) protective orders to encourage the full disclosure of relevant evidence, it cannot impinge upon the authority of the Executive Branch to decide who is to be accorded use immunity.").  The Court does not challenge that decision, and the Court has no way of knowing whether testimony from Officer Slaughter would have helped or hindered the Government's ability to carry its burden of proof.  The Court simply points to the

All of these questions indicate that the jurors were trying to sort through the evidence pertaining to the severity of the crime that Officer Parker and Officer Slaughter were investigating and Mr. Patel's possible resistance to the officers' investigatory stop and pat down, considerations that correspond directly to the "totality of the circumstances" jury charge.  Before the jury retired to deliberate, the Court instructed the jurors:  "Whether a specific use of force is reasonable or unreasonable depends on the totality of the facts and circumstances of each case." (Doc. 69, p. 152).  The Court continued:  "Those facts include the severity of the crime the person is being arrested for; whether a suspect [poses] an immediate violent threat to others; and whether the suspect resists or flees."  (Docs. 69, 152). When the jurors asked about the pat down and the green card, at the Government's urging, the Court responded by repeating the totality of the circumstances instruction; the Court did not answer the green card question.  (Doc. 71, pp. 4-24). The Court refused defense counsel's request for additional instructions concerning reasonable suspicion, but the Court cautioned counsel for the Government that the

---

fact that jurors from the first trial indicated that this gap in the evidence affected their assessment of the evidence and the Government's ability to fulfill its burden of proof.

This evidentiary void affected not only the Government's ability to sustain its burden of proof but also Mr. Parker's right to a fair trial.  When all was said and done, three of the witnesses who Mr. Parker had subpoenaed for trial—Chief Muncey, Captain Cook, and Officer Slaughter—had been implicated in potential misconduct that affected their ability to testify at trial.  (Tr. 9/8/15). This was no small matter.

Court was concerned that a simple restatement of the totality of the circumstances instruction would not answer the jurors' question.

It would not be surprising—in fact, it would be logical—if the jurors who posed these questions to the Court remained uncertain about the significance of the evidence concerning reasonable suspicion. The jury instructions dictate that such uncertainty would have consequences. The instructions state: "The government must prove guilt beyond a reasonable doubt. If the government fails to do so, you must find Mr. Parker not guilty." (Doc. 69, p. 149). "Proof beyond a reasonable doubt is proof so convincing that you would be willing to rely and act on it without hesitation in the most importan[t] of your own affairs." (Doc. 69, p. 149).[26] The jurors' remarks about Officer Slaughter and the absence of video evidence concerning Mr. Patel's hands indicate that the jurors were paying close attention to the evidence and that the evidence was not sufficient to allow the jurors to conclude unanimously beyond a reasonable doubt that Mr. Parker willfully violated Mr. Patel's constitutional right to be free from an unreasonable use of force.[27]

---

[26] This instruction is taken verbatim from the Eleventh Circuit Pattern Jury Instructions. *See* Eleventh Circuit Pattern Jury Instruction 3 (2010).

[27] Without answers to these questions, jurors in the first trial did not have to reach the disputed evidence concerning the nature of the takedown. In both trials, the Government presented lay opinions that Officer Parker used a leg sweep to take Mr. Patel to the ground. In both trials, Mr. Parker testified that he fell to the ground with Mr. Patel, and he presented witnesses who provided testimony that substantiated his testimony. Neither the Government nor Mr. Parker

B.     Reasons for Maintaining the Seal

The Court finds that it is appropriate to continue to withhold from publication information concerning jurors and their deliberations.  The Court is redacting that information from the transcripts that will be published.  Doing so protects the jurors from possible public ridicule.  Maintaining the confidentiality of this information also minimizes the impact that media coverage of jurors may have on jury selection for a potential trial in Mr. Patel's civil case or in the state criminal prosecution.

As a general matter, the Court does not ordinarily publish a transcript of the jury selection process unless a party requests a transcript for purposes of challenging some aspect of jury selection on appeal.  For reasons unique to this case, the Court has decided to publish the transcript of jury selection from the second trial.[28]

---

attempted to introduce expert testimony that would have assisted jurors in resolving this dispute. Experts in biomechanics frequently provide scientific proof concerning the force with which a body moves and the types of injuries that such movement can be expected to produce.  *See Berner v. Carnival Corp.*, 632 F.Supp.2d 1208, 1212 (M.D. Fla. 2009) (providing lengthy discussion of expert testimony from biomechanical engineers and recognizing that "'that 'biomechanics are qualified to determine what injury causation forces are in general and can tell how a hypothetical person's body will respond to those forces'") (quoting *Laski v. Bellwood*, 215 F.3d 1326 (6th Cir. 2000)).  Such scientific evidence might have shifted the balance of the evidence in one direction or the other.

[28] As discussed above, before the trial began, the Court issued an order regarding the use of electronic recording devices in the courtroom.  Before the Court began jury selection in the case, the Court, thinking that members of the press were present, provided instructions consistent with the written order.  (Tr. 10/26/15).  Once jury selection was underway, the Court learned that members of the Court staff had told members of the press that there was no room for them in the

The Court is redacting from the transcript of the jury selection process all personal identifying information pertaining to members of the venire and all portions of jury selection that were conducted outside of the hearing of the full courtroom.   Potential jurors provide sensitive information to the Court to fulfill their obligation, by oath, to provide complete, truthful answers to the questions posed during voir dire, but potential jurors do so outside of the hearing of the others in the courtroom with the understanding that their confidences will be maintained.   The Court will not violate that confidence.   The publication of such information in any case can diminish or destroy citizens' willingness to participate in the jury selection process, and the potential harm is more pronounced in a highly publicized case such as this one.   *See In re Greensboro News Co.*, 727 F.2d 1320, 1326 (4th Cir. 1984) ("[P]otential jurors will be more candid in their responses if they do not have to worry about what the public's opinion of those responses might be."); *United States v. King*, 140 F.3d 76, 80 (2d Cir. 1998) ("[T]he usual instruction to members of the venire not to read press reports of the trial, including jury selection, cannot be relied on to avoid inhibiting candor because the jurors might be told of press accounts of their responses by others, before they could prevent such communication, and because the jurors would fear the adverse

---

courtroom, and members of the press were forced to wait to be admitted to the courtroom.   The Court regrets the confusion.   The Court has published the jury selection transcript so that members of the press who tried to attend the jury selection but were unable to do so may have access to the conversations that took place in open court.

reaction of friends, employers, or others who might disapprove of the jurors' candid views."). Accordingly, the Court will publish a redacted transcript of jury selection in the second *Parker* trial.

**CONCLUSION**

That, as they say, is the rest of the story—at least as much of the story as the Court knows based on the evidence in the record of this federal criminal case. As noted, neither Chief Muncey nor Captain Cook testified at trial or in the evidentiary hearings, and there is other evidence that counsel for the parties opted not to offer at trial. By publishing not only the transcripts of the sealed evidentiary hearings but also the transcripts of chambers conferences that occurred during both trials—conferences that rarely are made public—the Court has attempted to share virtually everything that is in the record and provide as much transparency as possible while protecting the interests of jurors who did not volunteer for their roles in these trials and who discharged their duties in good faith.

In the big picture, this is only the end of a chapter. It is not the end of the entire story. The transcripts of the closed evidentiary hearings suggest that the story is more complicated than it appears at first blush. Having watched this chapter unfold, the Court can say that the attorneys, the jurors, and the reporters worked hard to tell this part of the story. That work will continue as other judges

and lawyers press forward to bring the complete story of this tragic series of events to a conclusion.

DONE and ORDERED this January 29, 2016.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE